Argued at Pendleton May 6; affirmed June 5, 1940

# OREGON & WESTERN COLONIZATION CO. *v.* JOHNSON ET AL.

(102 P. (2d) 928)

In Banc.

*Ed. R. Coulter,* of Weiser, Idaho (Smith & Smith, of Ontario, on the brief), for appellant.

*Robert D. Lytle,* of Vale (Lytle & Swan, of Vale, on the brief), for respondents.

*Dana E. Brinck* and *Fred A. Knutsen,* both of Spokane, Washington, *amici curiae.*

LUSK, J. As appears from the statement, the principal question for decision is upon the validity of the promise of the defendants to pay to the plaintiff the amount of the scaledown of the mortgage indebtedness to Summit Investment Company, namely the sum of $3,879.55, which is included in the note dated July 6, 1934. It is the contention of the defendants that the note and mortgage are, to that extent, void and unenforceable, being against public policy and the spirit and purpose of the federal legislation which made it possible for the defendants to refinance the real estate mortgage.

The loan to the Johnsons was made by the Federal Land Bank of Spokane pursuant to the Act of Congress of May 12, 1933, 48 Stat. at L. 48, 12 U. S. C. A. §§ 1016-1019, known as the Emergency Farm Mortgage Act, which authorized the land bank commissioner to make loans for the purpose of refinancing any indebtedness secured or unsecured of the farmer, or which is secured by a lien on all or any part of the farm property accepted as security for the loan. 12 U. S. C. A. § 1016(e). It is provided that the amount of the mortgage given by any farmer, together with all prior mortgages or other evidence of indebtedness secured by such farm property of the farmer, shall not exceed 75 percentum of the normal value of the farm, *ib.* § 1016(b); the rate of interest is not to exceed 5 percentum per annum, and the mortgage may run for a period of 10 years, provision being made for extinguishment of the debt on an amortization plan by means of a fixed number of annual or semi-annual payments, *ib.*, 1016(c). This enactment was a relief measure passed at a time of economic depression and in a great national emergency to enable farmers struggling under

the load of oppressive debt to save their farms and rehabilitate themselves financially. In the administration of the law it became necessary, or was deemed advisable, in many instances to require creditors of the farmer to scale down their indebtedness as a condition of granting the loan, and this for two reasons, as pointed out by the court in *O'Neil v. Johnson,* 29 Fed. Supp. 307; namely, to protect the Federal Land Bank's financial position as the new creditor of the farmer, who had found it impossible to continue operations under his previous load of debts, and to extend relief to the farmers and enable them to work out their salvation. Such an administration of the law is undoubtedly harmonious with its spirit and purpose, and serves to further the high public policy which it was enacted to promote. See, *State v. Board of University and School Lands,* 65 N. D. 687, 262 N. W. 60. Obviously, where creditors enter into agreements with the Federal Land Bank to scale down their claims, and the loan is authorized and made on the faith of such agreements, a creditor, who collusively or secretly obtains from his debtor a promissory note for the difference between the amount paid the creditor from the proceeds of the loan and the full amount of his claim, is flouting the policy of the law. And the courts, therefore, have, in a practically unbroken line of decisions, held promissory notes and other agreements given under such circumstances to be void and unenforceable. We quote from the opinion in *O'Neil v. Johnson,* supra:

"There are two reasons behind the law which holds notes obtained in violation of scaledown agreements invalid. In the first place, the Federal Land Bank wishes to protect its own financial position as the new creditor of a farmer who has found it impossible to continue operations under his previous load of debts.

Promissory notes extracted from the debtor to make up the difference between the amount paid under a scaledown settlement and the amount originally owed, rebuild the very debt structure which was reduced by the scaledown agreement. The farmer is placed in his old position, with the only change being that of the personnel and the order of his creditors. The fact that the Federal Land Bank holds a first mortgage or a first deed of trust is no answer to the creditor who has extracted a promissory note out of the debtor, for the favored lien position of the Land Bank does not give rise to the true security which is intended, namely, the security of a successful farm, whose earnings were ample to assure repayment of the Land Bank loan. The farmer, as already demonstrated, is unable to realize sufficient income to take care of his obligations under his former load of debts. Hence the courts declare promissory notes obtained in violation of a scaledown agreement, and which recreate the old debt structure, void.

"In the second place, and as a corollary of the first, the Federal Land Bank wishes to extend relief to farmers so that they are able to continue operations on their property. The purpose of the Federal Land Bank Law would be nullified if creditors were able to obtain second lien or unsecured notes in addition to the payments which they receive under the scaledown agreements. The Land Bank was established to assist farmers; it was not created so that a federal agency might acquire farm lands by foreclosure proceedings. By means of debt reduction, the farmer was to be placed in a position where he might make a success of his business. If the individual creditor were permitted to ignore the debt reduction and were allowed to exact notes for the balance of the old debt, the farmer would be no better off than he had been before the Land Bank came to his assistance with a loan. Hence, in order to carry out the primary purpose of the law, the courts have declared such creditors' notes void."

In the following cases involving Federal Land Bank loans the courts applied the rule under discussion: *Kniefel v. Keller, et al.,* —Minn. —, 290 N. W. 218; *Geel v. Valiquett,* 292 Mich. 1, 289 N. W. 306; *Scheuer v. Balik,* 130 Fla. 255, 177 So. 731 (decided under clean hands doctrine); *Jones v. McFarland,* 178 Miss. 282, 173 So. 296; *Oldham v. Briley,* — Tex. Civ. App. —, 118 S. W. (2d) 797 (question of misrepresentation held for jury); *Federal Land Bank v. Koslofsky,* 67 N. D. 322, 271 N. W. 907 (note cancelled at suit of bank); *Smeltzer v. McCrory,* — Tex. Civ. App. —, 101 S. W. (2d) 850; *Russell v. Douget,* — La. —, 171 So. 501. In numerous cases arising under the Home Owners Loan Corporation Act of 1933, 48 Stat. at L. 128, 12 U. S. C. A. § 1461, *et seq.,* which present the same character of question, the courts quite uniformly have condemned agreements such as that here under attack. These cases may be found assembled in annotations in 125 A. L. R. 809, 121 A. L. R. 119, 110 A. L. R. 250.

The plaintiff, conceding the legal principle, contends that it is without application to the facts of this case, because as it says, the defendants' promise to pay to it the amount of the scaledown was given with the full knowledge and approval of the bank. The plaintiff asks us to accept as true the testimony of W. P. Davidson, its president, to the effect that he told representatives of the bank that the Johnsons would be required to pay the scaledown, and relies especially upon the letter of January 9, 1934, hereinabove quoted, written to the bank by C. C. Mueller, its local correspondent at Vale, Oregon. It points, also, to the fact that the only agreement to accept as full payment a lesser sum than the amount owing on the Johnson mortgage was made not by it but by Summit Investment Company, and that,

even so, the agreement was not to accept the sum of $9,111.54, the amount actually paid by the bank, but $11,600.

For a just appraisal of the effect of the evidence it is essential to bear in mind the relations that existed between Summit Investment Company and the plaintiff, and the latter's position with respect to the mortgage which it had assigned to the former. Both corporations had their principal offices at St. Paul, Minnesota, and over a period of 18 years Summit Investment Company had purchased from the plaintiff numerous notes and mortgages representing large sums of money. It would seem that, while it was the plaintiff's business to finance farmers, it was Summit Investment Company's business, or a part of it at least, to finance the plaintiff. These transactions ordinarily took the course pursued with the Johnson mortgage; that is, besides the endorsement of the note and assignment of the mortgage, W. P. Davidson, president of the plaintiff corporation, was required to give his personal guarantee that the note would be paid. In addition, Davidson, in this instance, guaranteed eight per cent interest, whereas the Johnsons, by the terms of their mortgage, were required to pay only seven per cent.

Whether the plaintiff itself remained liable to Summit Investment Company on the note after its transfer is, under the evidence, difficult to determine. But, in the view we take of the case a decision of that question is unnecessary. It suffices that the plaintiff claimed, and still claims, that it was so liable, and relied upon its legal obligation to pay Summit Investment Company the difference between the amount received by the latter from the Federal Reserve Bank and the amount then owing on the mortgage as an answer to the

defendants' contention that it made a voluntary payment, and therefore that the note here sued on was without consideration in so far as that deficiency is concerned.

It is not too much to say, therefore, that, viewed from its standpoint, the plaintiff was at least as vitally interested in approval of the Johnsons' application for a federal farm loan as was the Summit Investment Company. It stood in the position of mortgagee, anxious that its debt be paid, and its conduct comported in every way with that character.

We think it a reasonable inference from the evidence that Mr. Davidson knew of the conditions attached to the granting of the loan. During the time that the negotiations were going forward he was having dealings with the Federal Reserve Bank regarding other such loans in which he was interested, and, as the testimony shows, was not without knowledge of the bank's methods. With the letter of January 9, 1934, from Mueller to the bank was enclosed Summit Investment Company's claim for $11,600 made out on the bank's regular printed form and containing the claimant's agreement "that directly or indirectly no note, mortgage, or other consideration has been or will be received from the debtor incident to such acceptance, other than the amount named in this paragraph; and that when said consideration is paid all of my claims against the said debtor will have been satisfied in full. No person, firm, or corporation other than the undersigned is the owner of any interest in said indebtedness." The information in that letter that Oregon & Western Colonization Company would pay Summit Investment Company the difference between the amount of the claim and the amount owing came from W. P.

Davidson, as he testified. It does not appear how the claim got into Mueller's hands, but it is not a violent assumption that it was delivered to him by W. P. Davidson. Certainly we are justified in inferring that he saw it and knew its contents. On the part of the mortgagee he was the whole moving force in the transaction. He had conferences regarding it with representatives of the bank. On April 5, 1934, he wrote Mr. Peet, president of Summit Investment Company, advising him that the bank required a new assignment of the Johnson mortgage and had requested that *"we accept 3¼% bonds in lieu of cash"* (italics supplied). On April 17, 1934, he mailed the new assignment of the mortgage to the bank. On May 2, 1934, he wrote the bank from St. Paul, urging the speedy closing of this and two other loans. On May 12, 1934, E. H. Davidson, his brother, and agent of the plaintiff at Ontario, wrote the bank regarding some details of the transaction and again urging speed.

■ W. P. Davidson appears to have conferred with representatives of the bank at Spokane in the month of April, 1934. He testified that he informed C. T. Miles, who was at that time the official in charge of closing loans in Oregon, that the Johnsons were going to be required to pay the scaledown. Miles denied this, and stated that if he had known the loan did not consolidate the indebtedness he would not have closed it. H. H. MacKay, who in 1933 and 1934 was assistant secretary in charge of loans, testified that the bank knew nothing of the arrangement and that if the facts had been known a reconsideration by the loan committee would have been necessary. Mueller was not a witness and his failure to testify is not explained. But, as he was a mere local correspondent, obviously his knowledge

that the Johnsons had agreed to pay the scaledown, assuming that he had been advised of it, would not have been the knowledge of the bank.

■ The circuit court found that the bank was not informed of the agreement. We concur in that finding, not only because of the weight which attaches to the trial judge's estimate of the value of the testimony where the witnesses appear before him—as did W. P. Davidson, though the testimony of Miles and MacKay was given by deposition—but because the circumstances tend strongly to defeat plaintiff's contention. It is right to assume that responsible employees of a federal agency have properly discharged their duty. There can be no doubt that Miles and MacKay would have failed in that regard had they, with the knowledge before them in their records of the condition on which the loan was approved, the acceptance of those conditions by the debtor and by Summit Investment Company, and the latter's solemn agreement, neither directly nor indirectly to receive a note, mortgage or other consideration from the debtor, proceeded to close the loan in the face of information that the conditions and agreement would not be observed. Their duty, then, would have been to refer the matter back to the executive committee of the bank which had authorized the loan; and it may well be doubted that either the official in charge of closing loans in Oregon or the assistant secretary in charge of loans would have been empowered to take any other course.

We are of the opinion, moreover, that the very evidence upon which the plaintiff so confidently relies, namely, Mueller's letter of January 9, 1934, serves but to confirm the charge of secrecy and evasion. As stated, the information in that letter was given Mueller by W.

P. Davidson. In substance, it advised the bank that the plaintiff would pay Summit Investment Company the difference between the proceeds of the loan available for payment to the latter, and the amount owing on the mortgage. That was but a half truth. The whole truth was that the plaintiff would pay this difference in the first instance, but would require the Johnsons to pay it in the end—the very result the bank was seeking to guard against by the conditions which it attached to approval of the loan.

There is further evidence which emphasizes the plaintiff's purpose to hide the facts. Under date of September 20, 1934, C. T. Miles addressed a letter to the plaintiff advising it that the bank had just been informed that the plaintiff had obtained the note in question from the Johnsons and a crop mortgage to secure it. The letter states:

"Our borrower stated that this amount was represented by approximately $4500.00 of old indebtedness and advance of $1000.00 for operating expense for 1934."

The letter proceeds to complain of the plaintiff's failure to furnish a creditor's statement before the loan was closed, calls attention to the conditions of the loan and the fact that a crop mortgage would interfere with the borrower's ability to take care of his taxes, interest and installments, and asks that the bank be informed why this debt was not taken into consideration prior to the time of closing the loan. W. P. Davidson answered this letter under date of October 3, 1934, as follows:

"Your letter of September 20th was received during my absence from the city.

"The information which you have regarding the crop mortgage of the above party is correct. Included

in this mortgage is $1,576.05 which we were to advance Mr. Johnson for this years crop operations. Of this amount he still has a credit of $262.25.

"In all probability Mr. Johnson will be able to liquidate at least two thirds of this indebtedness out of his crop this season. Should you later on wish to have a report of the returns on his crop, we will be pleased to furnish you with same.

"While we have not made any definite arrangements we are willing to carry Mr. Johnson for another season, and in that case it is our intention to advance him sufficient money to take care of his payment to the Federal Land Bank. However, I might add that I am not sure at this time that Mr. Johnson will want us to finance him next season."

The significance of the foregoing communication lies in what it omits. It does not pretend to answer the direct question in Miles' letter "why this debt was not taken into consideration prior to the time of closing the loans". Mr. Davidson is an intelligent man with a long and varied experience in business affairs. Obviously he has a good understanding of ordinary English, and the only conclusion we can come to, after reading this correspondence, is that he did not answer this simple question because he did not wish the Federal Land Bank to know that his company had taken from the Johnsons a promissory note and a crop mortgage in violation of the terms and conditions upon which the bank made the Johnson loan.

The fact that the Summit Investment Company's undertaking not to receive a note from the mortgagor was contained in its agreement to accept $11,650 in full payment of its claim, while only about $9,000 was realized, does not erase the taint of fraud from the transaction. The amount owing on the mortgage at the time the claim was presented was $12,600 with

interest at the rate of seven per cent from March 6, 1933. The note which plaintiff took from the Johnsons included not only the difference between the proceeds of the loan and $11,650, but an additional amount sufficient to pay the mortgage in full. Even though it could be said that there would have been no breach of faith in taking a note for the difference between the proceeds of the loan and $11,650—which is a doubtful proposition —it was a plain violation of the agreement to secure the debtors' promise to pay the amount in excess of $11,650. The fraud permeates the entire transaction, and, if there is any good in it, we decline to separate the good from the bad and declare it lawful in part and unlawful in part. We hold, moreover, under the circumstances disclosed by the evidence and which have been here delineated, that the agreement of Summit Investment Company was as much the agreement of the plaintiff, in so far as the determinative question in this case is concerned, as though the plaintiff had itself executed it.

One further contention of the plaintiff needs to be considered. It is urged that even though relief be denied the plaintiff the circuit court erred in giving the defendants a judgment, because they, too, were parties to the unlawful agreement. In support of this position they cite the case of *Anderson v. Horst,* 132 Pa. Superior Ct. 140, 200 Atl. 721, where the court, in holding void as against public policy a similar agreement executed in connection with a loan from the Home Owners Loan Corporation, refused to allow the mortgagor to recover payments made on the void note, saying:

"We recognize that the appellants here were parties to the unlawful agreement no less than the mortgagee, and, because of that, we will not permit them to use our courts to recover back payments made by them pur-

suant to it; but neither will we allow our courts to be used by the mortgagee as an instrument to enforce the illegal agreement, but will set it aside as contrary to public policy, when the help of the courts is sought to carry it into effect. See Restatement—Contracts, sec. 512; Miller v. Ammon, 145 U. S. 421, 12 S. Ct. 884, 36 L. Ed. 759.''

■ The Pennsylvania case may have been correctly decided under its facts, but the rule that forbids recovery upon an illegal bargain is not one of universal application. See, Restatement—Contracts, §§ 599-609, and especially § 604, which reads:

"Where the parties to an illegal bargain, though both blameworthy, are not in pari delicto, and one of them has not been guilty of serious moral turpitude, he can repudiate the bargain, and if he has rendered any performance thereunder, recover it or its value."

■ In *McAllister v. Drapeau,* 14 Cal. (2d) 102, 92 P. (2d) 911, 125 A. L. R. 800, and *Smeltzer v. McCrory,* supra, both of them cases involving scaledowns, the former under the Home Owners Loan Corporation Act, the latter under the Federal Farm Mortgage Act, the mortgagors were awarded judgments for payments made by them pursuant to such agreements, for the reason that they were not *in pari delicto* with those who had exacted the notes from them. We think the facts of the instant case bring it within the doctrine of those decisions. The defendants were in a position where they scarcely dared to refuse to yield to their creditors' demands. "They were not entirely free agents", as the court said in *McAllister v. Drapeau,* supra. The defendant, Trent Johnson, could neither read nor write, and his wife was a women of limited education and without business experience save in connection with the op-

eration of their ranch. They appeared to have had implicit confidence in the integrity and business capacity of the officers of the plaintiff corporation, and were not on an equal footing with them in their dealings. Doubtless it would never have occurred to either of the defendants that there was any impropriety in giving this note and mortgage. We think, therefore, that the general rule should not be applied to this case.

■ We have examined the evidence submitted by the defendants to establish the amount of their overpayment. Save for one small item of interest, the plaintiff does not appear to dispute seriously the correctness of the defendants' accounting on the theory on which it was made—namely, that the amount of the scaledown included in the note was not a valid obligation of the defendants. The question whether the interest item referred to was properly charged against the defendants depends upon whether they should have been given credit for a payment of $3,100, as of the date that they delivered a crop of hay to the plaintiff under an agreement that such hay, at an agreed price per ton, was to be accepted as payment on defendants' indebtedness, or whether a later date, when a compromise agreement regarding this transaction was entered into, should control. As far as the record discloses, plaintiff received the hay at the earlier date, and had the benefit of it from that time, which properly may be considered the date of payment, and the interest was, in our opinion, correctly credited back to the defendants.

We therefore affirm the decree of the circuit court dismissing the suit and granting the defendants judgment as prayed for in their answer.

RAND, C. J., and KELLY and BELT, JJ., concur.

ROSSMAN, BEAN and BAILEY, JJ., not sitting.