MAY, Appellant, v. WHITBECK, Respondent.

(No. 8,109.)

(Submitted January 29, 1941.   Decided April 2, 1941.)

[113 Pac. (2d) 332.]

*Mr. D. L. O'Hern* and *Mr. P. F. Leonard,* for Appellant, submitted an original and a reply brief; *Mr. Leonard* argued the cause orally.

*Mr. George W. Farr,* for Respondent, submitted an original and a supplemental brief, and argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

This appeal is taken from a judgment of the district court of Custer county wherein judgment was entered for the defendant and suit was dismissed. The action was brought on a promissory note for $500, and the matter was tried without a jury. The facts out of which the suit arose are these:

Joseph H. May, the original plaintiff who died during the pendency of this action and whose administratrix was substituted in his place, was the owner of certain real estate which he sold to one T. E. Sad on March 26, 1932. Under the agree-

ment of sale, Sad agreed to pay as the purchase price the sum of $2,000, with some of the payments deferred. Sad apparently was in default on January 6, 1934, when the Federal Land Bank approved his application for a loan in the amount of $3,000, to be secured by land purchased from May and by other land. The application was made pursuant to the provisions of the Emergency Farm Mortgage Act of 1933. This Act was passed for the purpose of affording relief to distressed farmers and ranchers whose indebtedness had become excessive by reason of the economic depression commencing in 1929. The amount for which Sad's loan was approved was not sufficient to take care of all of his indebtedness. He was indebted not only to May, but also to other creditors, and it was therefore necessary for him to prevail upon his creditors to reduce their claims, as under the provisions of the federal Act before his loan could be made it was required ''no loan shall be made under this section unless the holder of any prior mortgage or instrument of indebtedness secured by such farm property arranges to the satisfaction of the Land Bank Commissioner to limit his right to proceed against the farmer and such farm property for default in payment of the principal.'' A form of agreement was prescribed by the Federal Land Bank known as a ''composition agreement,'' and on March 1, 1934, May signed such an agreement, which recited that he held a claim against Sad in the amount of $1,800, and which then provided: ''I agree to accept the sum of $1,150 net in full satisfaction of said claim'' and upon such payment ''all evidence of such indebtedness together with a properly executed release of such encumbrance will be delivered to you upon making such payment. I further agree that directly or indirectly no note, mortgage or other consideration has been or will be received from the debtor incident to such acceptance other than the amount named in this paragraph; and that when said consideration is paid all of my claims against the said debtor will have been satisfied in full.'' On the same day, March 1, 1934, on which May signed the composition agreement, there was executed another agreement which provides in full as follows:

"Agreement.

"Whereas, Torstein E. Sad has requested J. H. May to sign a statement to the Federal Land Bank showing the balance due May on the land hereafter described and said Sad has agreed and does hereby agree to forthwith and at once before the completion of the loan applied for by him from said bank to pay May $650, so that the balance due will be $1,150.

"Now, therefore, May has agreed to sign said statement under said conditions. If Sad fails or neglects to pay the said $650 forthwith or before the federal loan is ready for completion, May will not be required to deliver deed to Sad.

"It is agreed that May is to receive $1,800.00, $650 from Sad and $1,150 from the federal loan.

"The lands described being Lots 1 & 2 and E 1½ N W. ¼, W½ N E ¼, N E ¼ N E ¼, N W ¼ S. E. ¼, less 7.79 acres for highway in Sec. 18 T 1 N R 49, being 311.75 acres.

"Dated Mar. 1, 1934.

"J. H. MAY

"TORSTEIN E. SAD."

Only $50 was paid by Sad under this agreement. Various transactions occurred later which resulted in a reduction of the amount of the federal loan to $2,400; and two other composition agreements were signed by May, one on May 17, 1934, and another was signed on April 18, 1935, wherein he recited that $1,250 was due, and he agreed to accept the sum of $1,000. The form of this agreement had a further provision in it that, "I hereby represent that I have no understanding or agreement with said debtor that after said loan is closed any evidence of debt or other consideration will be given me by him for the amount by which I have agreed to reduce my claim or any part thereof."

Subsequently the loan was completed and something over $900 was paid to May, who then deeded the property upon which the loan was made to Sad's wife, and May executed a receipt dated June 26, 1935, which recited that the amount was received in full satisfaction of all claims of May against Sad of whatsoever kind, and that May released Sad from all debts, claims and de-

mands which he had against him. The note in question was dated May 17, 1934, the same date the second composition agreement was signed by May.

The findings are, and they are supported by the evidence, that neither the Federal Land Bank nor the land bank commissioner nor any of its agents, knew anything of the agreement between Sad and May of March, 1934, or of the note here in question. The substance of the findings of fact of the court as to the note is amply supported by the evidence, and they set out the fact situation as it appears:

XII.   That on or about the 17th day of May, 1934, the plaintiff, Joseph H. May, notwithstanding the making and execution by him of the composition agreements, and in furtherance of his secret agreement of March 1, 1934, with his debtor, Torstein E. Sad, without the knowledge of the said Federal Land Bank or the Land Bank Commissioner or of any creditor of the said Torstein E. Sad, in secret and in violation of the said composition agreements and for the purpose of obtaining an unfair advantage of Torstein E. Sad's other creditors, did fraudulently and unlawfully, for the purpose of defrauding Torstein E. Sad and the Federal Land Bank and the Land Bank Commissioner and other creditors, solicit and importune, require and exact of Torstein E. Sad that he obtain and deliver to him a note made and executed by some person financially responsible in the sum of $500. That pursuant thereto Sad obtained from this defendant, Ed Whitbeck, the paper which was signed by this defendant at the request of Sad [his son-in-law] with the specific understanding and agreement between him and Sad that Sad would also sign as maker, and that Sad would place his name on said paper over and above this defendant's name, and that Sad, if and when the said paper should be used as a promissory note would be treated and considered as the maker and this defendant would be considered as an accommodation maker with Sad. That the note was so signed by this defendant and delivered into the possession of Sad, but at the time of the delivery of said note the other blanks therein were not filled in. That Sad did deliver said incompleted note with this defendant's

signature thereon to Joseph H. May in response to the solicitations of May. That in making the creditor's statements or composition agreements, May wrongfully, fraudulently and unlawfully concealed from the Federal Land Bank of Spokane and the Land Bank Commissioner the fact that he had theretofore received from Sad said note.

XIII. That at the time the note was delivered by Sad to May, May had promised to Sad, the Federal Land Bank and the Land Bank Commissioner, and the other creditors of Sad by the composition agreements of settlement, to accept a sum less than the amount then due and owing to him by Sad, and the taking by him of the note was in violation of said promise and agreement, and was a fraud upon the bank and the commissioner, and upon Sad and his other creditors, and was designed to, and if permitted to be enforced, would permit May to obtain a preference over the other creditors of Sad.

A study of the evidence shows clearly and conclusively that the purpose of taking the note was to circumvent the requirements of the federal statute, and that the actual debtor was Sad rather than the defendant, and that it was understood between Sad and the defendant that Sad was to be the maker of the note, and that this note was secured with the knowledge and upon the solicitation of May. The whole course of May's conduct beginning with March 1, 1934, when he signed the first composition agreement and at the same time exacted from Sad an agreement to pay the difference between the amount he agreed to accept from the Land Bank and the total amount of the obligation, and continuing through May 17, 1934, when he signed another composition agreement and at the same time forced Sad to secure the defendant's note, and through April 18, 1935, when he signed the third composition agreement, shows without question that his purpose was to violate the terms of his voluntary agreements with the Land Bank, and by his representations to other creditors to gain an unfair advantage of them. There can be no question that other creditors had no knowledge of these attempts of May to secure full payment of Sad's obligation to him, while representing to other creditors and to the Land Bank

that he was actually making a reduction in line with those of the other creditors.

The court found the note to be void and of no effect as being in violation of public policy, under subdivision 2, section 7553, Revised Codes, which provides: ''That is not lawful which is * * * 2. Contrary to the policy of express law, though not expressly prohibited,'' and we find that that ruling was correct.

The courts of other jurisdictions have passed on this question of side agreements between the creditor and the debtor where the loan is secured from the Home Owners' Loan Corporation, as well as under the Act before us. In these cases the agreement sought to be enforced was a direct agreement by the debtor to pay an amount in addition to the sum the creditor agreed to accept in full discharge of the debtor's obligation to him. A leading case is *O'Neil* v. *Johnson,* 29 Fed. Supp. 307, where, in speaking of the purpose of the Act and the public policy announced in it, it is said: ''There are two reasons behind the law which holds notes obtained in violation of scale-down agreement invalid. In the first place, the Federal Land Bank wishes to protect its own financial position as the new creditor of a farmer who has found it impossible to continue operations under his previous load of debts. Promissory notes extracted from the debtor to make up the difference between the amount paid under a scale-down settlement and the amount originally owed, rebuild the very debt structure which was reduced by the scale-down agreement. The farmer is placed in his old position, with the only change being that of the personnel and the order of his creditors. The fact that the Federal Land Bank holds a first mortgage or a first deed of trust is no answer to the creditor who has extracted a promissory note out of the debtor, for the favored lien position of the Land Bank does not give rise to the true security which is intended, namely the security of a successful farm, whose earnings were ample to assure repayment of the Land Bank loan. The farmer, as already demonstrated, is unable to realize sufficient income to take care of his obligations under his former load of debts. Hence the courts

declare promissory notes obtained in violation of a scale-down agreement, and which recreate the old debt structure, void.

"In the second place, and as a corollary to the first, the Federal Land Bank wishes to extend relief to farmers so that they are able to continue operations on their property. The purpose of the Federal Land Bank Law would be nullified if creditors were able to obtain second lien or unsecured notes in addition to the payments which they receive under the scale-down agreements. The Land Bank was established to assist farmers; it was not created so that a federal agency might acquire farm lands by foreclosure proceedings. By means of debt reduction, the farmer was to be placed in a position where he might make a success of his business. If the individual creditor were permitted to ignore the debt reduction and were allowed to exact notes for the balance of the old debt, the farmer would be no better off than he had been before the Land Bank came to his assistance with a loan. Hence, in order to carry out the primary purpose of the law, the courts have declared such creditors' notes void." The note was held to be void as against public policy. (See, also, *Oregon etc. Co.* v. *Johnson,* (Or.) 102 Pac. (2d) 928.)

Another leading case is *Anderson* v. *Horst,* 132 Pa. Super. 140, 200 Atl. 721, which deals with a loan under the H. O. L. C. Act, where the court said, among other things: "The mere fact that he exacted the instrument in suit, while the negotiations were pending and after he had agreed to accept a definite number of bonds in full settlement, denotes bad faith toward the lending agency. When he agreed to an acceptance of each reduction of bond interest, the acceptance related back to the first agreement and was a reiteration of the promise there made to accept the bonds agreed upon in full settlement of the defendants' obligation in accordance with the rules of the lending corporation deemed necessary to rehabilitate the home owner. By means of the secret agreement the plaintiff could not defeat the express terms of his own agreement to accept the bonds of the lending agency in full settlement of the defendants' obligation." (See, also, *Russell* v. *Douget,* (La. App.) 171 So. 501;

*Federal Land Bank* v. *Blackshear Bank,* 182 Ga. 657, 186 S. E. 724; *Kniefel* v. *Keller,* 207 Minn. 109, 290 N. W. 218; *Geel* v. *Valiquett,* 292 Mich. 1, 289 N. W. 306; *Jessewich* v. *Abbene,* 154 Misc. 768, 277 N. Y. Supp. 599; *McCrory* v. *Smeltzer,* 132 Tex. 383, 124 S. W. (2d) 336; and see collection of cases on this point arising under the H. O. L. C. Act, in 125 A. L. R. 809, 121 A. L. R. 119, 110 A. L. R. 250, and *Stager* v. *Junker,* 14 N. J. M. 913, 188 Atl. 440.)

What is said in these cases is controlling here, even though the note was not signed by the principal debtor but by this defendant who signed the note upon the solicitation of the debtor who procured the signature in turn upon the solicitation of May.

The agreement of March 1, 1934, was void under the cases and this note was secured for the purpose of carrying out, and in furtherance of, that void secret agreement, and it was tainted with the same illegality. The court found in effect that all of the proceedings here involved one transaction, and that is apparent from a study of the record. The evidence discloses beyond question that the obligation was in reality Sad's and that the note was secured from Whitbeck so as to make it appear that Sad's obligation to the extent of $500 had been paid, when in fact it had not been. The court found, as the evidence shows, that Sad was to sign the note as a maker and that his name was to be signed over and above that of defendant. In addition to the testimony of the defendant, this finding is supported by the note itself, which has the defendant's signature on the second line provided for signatures, with the first line blank. Had Sad signed the note as agreed, the case would have come squarely within the facts of *Oregon etc. Co.* v. *Johnson,* supra. The fact that he did not sign it in view of May's part in the transaction makes no difference. It was secured for the purpose of carrying out the scheme set out in the agreement of March 1, 1934, to defraud the Land Bank, other creditors and the debtor.

The mere substitution of a new party for one already a party to an illegal contract, carrying into effect in a new form an invalid contract, will not relieve it from the effect of the illegality of the original consideration. (*Wallace* v. *Benner,* 200

N. C. 124, 156 S. E. 795; *Hall* v. *Edwards,* (Tex. Com. App.) 222 S. W. 167; *Scoggins* v. *Furst & Thomas,* (Tex. Civ. App.) ·9 S. W. (2d) 405.)   Pertinent here is the text of 17 C. J. S. 283, where it is said:

"*A contract is rendered illegal by a prior illegal contract with which it is connected and out of which it immediately grows.*   Where a contract grows immediately out of, and is connected with, a prior illegal contract, the illegality of such prior contract will enter into the new contract and render it illegal; and the rule has been broadly laid down that, if the connection between the original illegal contract and the new contract can be traced, and that if the latter is connected with, and grows out of, the former, no matter how many times and in how many different forms it may be renewed it cannot form the basis of a recovery.   So, every new agreement in furtherance of, or for the purpose of carrying into effect, any of the unexecuted provisions of a previous illegal agreement is likewise illegal and void, as is a contract the performance of which depends on performance of a prior invalid contract.   *   *   *

"*Securities given in illegal transaction.*   It follows from the principles just stated that notes given for illegal claims, or as the consideration for illegal promises, cannot be enforced, see the title Bills and Notes, para. 154, and the same is true of deeds, bonds, mortgages, and other securities."

Some contention is made that May was a holder in due course ▮▮▮▮▮ of the note.   What we have said as to the facts demonstrates that this is not true.   He was not a holder in due course, and the defendant as an accommodation maker at most could interpose any defense that Sad could, had Sad signed the note as he agreed.   See 7 C. J. 254, and 11 C. J. S. 305, where it is said: "Recovery cannot be had against an accommodation maker of a note in the absence of liability of his co-maker and principal thereon, and where the maker of a note is not liable thereon, his accommodation endorser is not liable, and it has been held that a holder who is not a holder in due course because of some fact other than knowledge of the accommodation, would

be subject to the defense of absence of consideration in a suit against an accommodation maker.''

But it is contended by the plaintiff that the authorities cited supra, are inapplicable to the facts in this case, in view of the fact that the plaintiff in his last agreement filed with the Federal Land Bank stated that his claim against Sad was $1,250, and that no note was given or would be taken for the difference between that amount and the sum of $938.50 which was finally allowed on his claim. While it is true that no note or other instrument was in fact taken to cover this difference, still it is also true that at the time of the filing of the purported creditor's statement or composition agreement there was still actually due on the contract for deed the sum of $1,750, but $500 of the indebtedness was shifted to the shoulders of the defendant upon the acceptance of his accommodation paper, which fact was kept secret and was not disclosed to the Federal Land Bank and Land Bank Commissioner or to the other creditors who had likewise filed their creditors' statements and composition agreements with the Federal Land Bank. Were the plaintiff now permitted to recover from the defendant herein the additional amount of $500 over and above the amount agreed to be accepted from the Federal Land Bank out of the proceeds of the loan, it would necessarily follow that the defendant Whitbeck would have the right of contribution from the accommodated party, namely, Torstein E. Sad, in such sum. (11 C. J. S. 315.) In view of such right, the indebtedness of Sad was in no way extinguished or reduced by the mere delivery of the note in question to his creditor.

Error is specified on the admission of the testimony given by deposition of H. M. MacKay. The record shows that he was assistant secretary of the Federal Land Bank and manager of its Loan Closing Division. Most of the exhibits in the case were admitted on the basis of MacKay's deposition. He testified concerning his connection with the files in this loan, and stated that he had attached to the deposition copies of all those documents, which, on the basis of the questions put to him, he considered material. Any objection which the appellant might have had to the propriety of these proceedings he waived by

requesting MacKay in his cross-interrogatories to do exactly the same thing he now complains of. Had the exhibits been excluded by a proper objection to defendant's questions, they would be before the court on plaintiff's interrogatory to which no objection was made by defendant, and hence their admission in evidence has not injured the plaintiff. In the reply brief and in the third brief of appellant, designated ''Response to Final Brief,'' nothing further was said in connection with this specification of error. The court correctly admitted the deposition of MacKay and the attached exhibits.

The note being void as against public policy (subd. 2, sec. 7553, Rev. Codes), as set out in the Act (12 U. S. C. A. 1020), the judgment should be affirmed. It is so ordered.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN, ANDERSON and MORRIS concur.

Rehearing denied May 27, 1941.