EVANS et al. v. SHERIDEN et al.—186 S. W. (2d) 911.

Eastern Section.   July 15, 1944.

Petition for Certiorari denied by Supreme Court, December 3, 1944.

McAmis, J., dissenting in part; Burnett, J., dissenting.

J. W. Wagner and Chas. H. Neighbors, both of Chattanooga, for appellant Evans.

Chas. Allen Ward, of Chattanooga, for appellant Ward.

H. B. Mack, of Chattanooga, for appellees Sheriden.

H. W. Schoolfield, of Chattanooga, for HOLC.

HALE, J. This suit involves the validity of a series of 75 notes of $20 each and the second mortgage or deed of trust securing the payment thereof, executed by Sheriden and wife to appellant Ward, and of which appellant Evans purchased the last 42 without recourse. It is claimed the notes and mortgage were executed in violation of regulations of the Home Owners Loan Corporation, holder of first mortgage on this property, and were contrary to public policy. The Chancellor so held and complainants appeal.

In 1926, Mr. Ward contracted to build a residence for Mr. Sheriden at the price of $6338, to which were added certain extra items, making the total cost $6465, of which $3,000 was financed by a first mortgage to Chattanooga

Savings Bank & Trust Co. The remainder, $3465, was represented by a second mortgage executed by Mr. and Mrs. Sheriden to Ward, securing 99 notes of $35 each. In 1932 the remainder due on this second mortgage, $2040, was refinanced by the execution of a new second mortgage to Ward, securing 68 notes of $30 each.

Default was made on certain payments due on both the first and second mortgages, so that in the summer of 1934 there was due on the first mortgage something over $3800, and on the second mortgage approximately $2086.

Application was made by Mr. Sheriden to the Home Owners Loan Corporation for a loan, the amount of which is not shown. The date of this application is not shown and we do not know what disclosure, if any, was called for or made as to unsecured indebtedness, although Mr. Sheriden says he and Mr. Ward discussed the matter with HOLC officials. About this time—whether before or after the execution of the application is not shown—Mr. Ward took his notes and mortgage to the Register's office and released his second mortgage by marginal entry. At the same time Mr. Ward says he took from Sheriden and wife their note for $1500, due in 90 days, with the agreement that it would be covered by a second mortgage after the first had been refinanced. Mr. Sheriden admits executing a note but claims it was for $1,000. The evidence showed it was later surrendered to him. He does not produce it or account for its absence. It was the consideration for the notes in suit which amount to $1500. Consequently we hold the preponderance of the evidence establishes that the note was for $1500, although this is of minor importance. Pursuant to the application so made, the HOLC appraised the property at $4170 and upon which it made a loan of 80%, or $3336. Of the proceeds of this loan, the sum of $600.49 was deducted for taxes, repairs

and closing expenses, and the remainder, $2735.51, was paid the holder of the first mortgage in discharge of its debt which as noted amounted to over $3800. Nothing was paid to Ward. He made no statement to the HOLC, and was not a party to the transaction.

The HOLC mortgage is dated July 6, 1934, and was registered August 1, 1934. It contains this provision: ''If during the term of this deed of trust or any renewal thereof, the grantor or grantors shall execute any instrument or conveyance creating any lien on the property herein described, without the written consent and approval of the Home Owners Loan Corporation, then, at the option of the Home Owners Loan Corporation, or the lawful owner and holder of the indebtedness herein secured, the entire balance of said indebtedness, principal and interest, shall immediately become due and payable, and the right of foreclosure as herein·provided shall immediately accrue''.

The notes in suit, and second mortgage securing payment thereof, bear arbitrary date of July 6, 1934, but the mortgage was not executed until September 27, 1934. As pointed out, Ward's debt was $2086. He accepted $1500 in notes, or an abatement of $586. These notes were not to bear interest until three years after their maturity—an additional concession amounting to $270, or a total of $856 yielded by Ward. And the second mortgage in question had this provision: ''This Deed of Trust is made subject to a Deed of Trust executed by Jno. L. Sheriden and wife, Nell Sheriden, to J. Mitt Payne, Trustee, to secure Home Owners Loan Corporation $3336.00, dated July 6, 1934, and registered in Book N, Vol. 27, page 121 of the Register's Office of Hamilton County, Tennessee, and it is agreed and understood that if during a period of three years, we or either of us shall

fail to carry out all of the conditions, covenants, and warranties contained in the said Deed of Trust securing the Home Owners' Loan Corporation above recited, then and in that event the beneficiary in this deed of trust. Its successors or assigns, with the written consent of the State Manager for Tennessee of said Home Owners' Loan Corporation, may declare all of the indebtedness secured by this Deed of Trust due and payable and proceed to foreclosure under this Deed of Trust.''

Ward said that when these notes in suit and second mortgage were delivered, Sheriden told him this three year moratorium was in accordance with an HOLC ruling. Mr. Sheriden substantiates this by his redirect testimony:

''Q. I will ask you whether or not the deed of trust that the three year moratorium is on comply with the rules of the HOLC or not and so stated on the deed of trust?'' A. It does state it, yes sir.''

■ Sheriden insists that Ward had the notes and mortgage prepared, while Ward says it was done by Sheriden. Sheriden insists it was executed under a form of duress by Ward's threat to turn the matter over to his attorney for suit. However, on July 8, 1937, at the maturity of the first of these notes, Mr. Sheriden wrote Ward he was unemployed but had prospects which should materialize by October 1st, and saying: ''In the meantime if something develops for me I will take the notes up as fast as I can, but will appreciate it very much if you will help me along this line until I can get something to do.''

We hold there was no duress.

No HOLC official testified. So far as the record goes, it acquiesced in the giving of the second mortgage. Certainly, it has not exercised the option conferred by the portion of the mortgage heretofore quoted. It was made a party to this suit, but has not raised any question on

the validity of the notes and mortgage in question. There is no evidence whatever as to any rules, orders or directives issued by or under the authority of the HOLC.

The Chancellor found the following regulation was adopted by that authority: "Second Mortgages—Where the full amount of the indebtedness against the property cannot be refunded by the Corporation, the mortgagee or other lien holder will be permitted to take a second mortgage or second deed of trust if the amount of such second mortgage or deed of trust does not exceed the difference between the Corporation's appraisal and the amount of the Corporation's first mortgage. In no case shall the second trust or second mortgage to such other mortgagee or lien holder be in terms which would cause the mortgagor's payments to the Corporation to be a hardship or deprive the mortgagor of reasonable opportunity to pay such mortgage or second trust."

On request for additional findings, he found that this regulation was adopted by the Board of Directors of HOLC on August, 21, 1934, effective October 10, 1934, or after the notes and mortgage in question were executed. There is no evidence of the existence of this or any order by HOLC.

May we take judicial knowledge of the existence of such an order, when in fact we do not know that it exists? If so, must we read into it something retroactive so as to deprive the parties of the right to contract?

Counsel for appellant Ward has appended to his brief what he contends are copies of the Board's minutes of September 8, 1933, approving the following bulletin: "The Corporation may take up second mortgages or other inferior liens, provided the same is done along with the first mortgage and the total is within the Act. The Corporation has no means of preventing the home owner

from undertaking to pay any indebtedness he may owe over and above that refunded by the Corporation and has no means of preventing his giving a second mortgage or other security for any such indebtedness. However, State Managers are directed, as a matter of policy in dealing with home owners, to decline to conclude a refunding of a portion of the indebtedness against the home where the home owner is proposing to give a second mortgage for any excess indebtedness he may owe unless such second mortgage financing is so arranged that the home owner will have a reasonable probability of being able to carry his first mortgage to the Corporation and the second mortgage indebtedness".

And of November 3, 1933, approving the following: "In the case of bond exchange loans, if the home owner owns more than 80 percent of the value of his premises he may remain indebted for that portion that the Corporation cannot refund, provided the Corporation secures a first lien, and he may secure the excess indebtedness with a second lien. However, such refunding will not be carried though unless such excess indebtedness is placed on a payment basis so that the home owner will have a reasonable opportunity to pay the same and meet his obligations to this Corporation. The Corporation will not proceed to refund indebtedness for mortgagees who insist upon more in face value of bonds or who insist upon any other consideration (such as second mortgage, cash or other consideration) than the net amount owing to such mortgagee, together with accrued (sic) interest to date of exchange. The Corporation will not participate in any refunding where, by any means, the indebtedness of the home owner is increased or the home owner is being called upon to pay more than his debt with interest."

The phrase "judicial knowledge" has in many instances been stretched into a cover for mistakes of omission made in the preparation of a case for trial, especially where the equities were obvious.

Our cases of Smith v. Redwine, 26 Tenn. App. 104, 168 S. W. (2d) 185, and Kivett v. Cardwell, 26 Tenn. App. 372, 175 S. W. (2d) 334, and the cases therein referred to, set forth certain resolutions adopted by the HOLC. But they were proven and constituted a part of the record in those cases. If we recognize judicially facts adjudicated in another case, it makes those facts, although unsupported by evidence in the case at bar, conclusive against the opposing party without any opportunity on his part to meet and overcome them. 20 Am. Jur. "Evidence", Sec. 84, p. 102.

The defendant in somewhat general terms took the position that as the aggregate of the first and second mortgages was more than the appraised value of the property, the second mortgage was therefore contrary to public policy and null and void.

We think that any debtor who seeks to avoid an instrument so solemnly executed, should certainly and specifically plead his defence and should clearly establish the rule, regulation or conduct relied upon to defeat the claim.

The practice of attaching copies of alleged orders or directives to briefs in this court, without having proven them in the lower court, is dangerous and more calculated to defeat than to attain justice.

The Supreme Court of the United States, in a case decided in 1911, which has not been superceded by any current decision, held that state courts need not take judicial notice of the decisions of the Interstate Commerce Commission, saying:

"The next question to be considered is whether judicial notice should have been taken of the decision of the Commission in Glade Coal Co. v. Baltimore & O. R. Co., wherein, as it is said, the rate here in question was found to be unjustly discriminatory and the railroad company was directed to desist from its enforcement. The decision was rendered April 28, 1904, and authoritatively published in 10 I.C.R. 226, but was not mentioned in the pleadings or in the agreed statement of facts. In the supreme court of appeals of the state it was contended that the decision should have been judicially noticed by the trial court, but the contention was rejected, and that ruling is now challenged as contravening the provision in Sec. 14 of the Act, which reads: 'The Commission may provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use, and such authorized publications shall be competent evidence of the reports and decisions of the Commission contained therein, in all courts of the United States and of the several states, without any further proof or authentication thereof.'

"Undoubtedly, this provision makes the decisions of the Commission, as so published, admissible in evidence wthout other proof of their genuineness, but it does not require that they be judicially noticed, or relieve litigants from offering them in evidence as they would any other competent evidence intended to be relied upon. Its purpose is to relieve litigants from the inconvenience and expense of obtaining certified copies of the decisions by authorizing the use of the published copies, but it does not otherwise change the rules of evidence. The ruling, therefore, was not in contravention of the statute". Robinson v. Baltimore & O. R. R. Co., 222 U. S. 506, 32 S. Ct. 114, 116, 56 L. Ed. 288, at 290, 291.

Our statute widening the scope of judicial notice (Ch. 137, Acts 1943) requires "every Court of this State shall take judicial notice of the common law and statute of every State, Territory and other jurisdiction of the United States." It says nothing of orders, regulations and directives issued by the central government.

Our Supreme Court has uniformly required proof of the laws of a sister state. Stevens v. Bomar, 28 Tenn. 546; Templeton v. Brown, 86 Tenn. 50, 5 S. W. 441; Kennard v. Illinois Cent. R. Co., 177 Tenn. 311, 148 S. W. (2d) 1017, 134 A. L. R. 770; Dixie Ohio Express Co. v. Butler, 179 Tenn. 358, 166 S. W. (2d) 614.

█ Under the logic of these holdings we cannot judicially notice the rulings and orders of the various federal agencies when relied upon to defeat an otherwise valid instrument. The statute quoted (Ch. 137, Acts 1943) cannot be construed to cover these orders and directives.

We therefore are unable to find there was in effect any order or regulation of the HOLC at the time of the transaction in question which limited the right of the parties to execute or receive a second mortgage.

█ █ To the contrary, the fact that the second mortgage was given after conference with officials of HOLC, as stated by Mr. Sheriden; that the provision for a three year moratorium was in accordance with "the rules of the HOLC" as admitted by Mr. Sheriden—indicate existence of a rule or order authorizing the course taken. Certainly it is no crime to be a creditor, and it is not contra bonos mores to seek to collect a debt. Our constitutional guaranty goes to the security of property—not freedom from debt.

We do not have the elements of fraud, secrecy, duress or collusion that have existed in the cases where second

mortgages have been declared void as opposed to public policy. Kivett v. Cardwell, supra.

A contract should not be declared void as against public policy except in cases free from doubt and a prejudice to the public interest must clearly appear. Stansel v. Roach, 147 Tenn. 183, 246 S. W. 520, 29 A. L. R. 143.

It is said by appellees that the notes in question were fraudulently altered so as raise the interest rate from five to six per centum. The deed of trust, or second mortgage, executed by Mr. and Mrs. Sheriden provided the notes should bear interest at 6%. There is no contention that it has been altered and this to our mind is convincing evidence that the notes were to bear 6%. Although the Chancellor made no specific finding, it is evident he was of the same opinion.

It results that the decree of the Chancellor must be reversed and decree entered here for the notes exhibited with the record, and sustaining the second mortgage. If desired, the appellees may require bond under Code Sec. 9882 as to the notes which were lost. Cost will be charged appellees with judgment over against appellants if not collected from appellees.

McAmis, Judge, concurs except as to holding that the Court should not take judicial knowledge of H. O. L. C. orders, being of opinion it is not necessary to decide that question.

Burnett, Judge (dissenting).

I am compelled to dissent from the majority opinion of the court on this appeal because I am convinced that the majority opinion is contrary to all pronouncements on the subject. It is directly in the teeth of an unpublished opinion written by Judge Crownover of this court in 1938. The opinion to which I refer is: R. L. Hays v.

Commerce Union Bank et al., from Maury County Equity. A certified copy is found among the exhibits in the instant case. The majority opinion is likewise contrary to the case of McAllister v. Drapeau, 14 Cal. (2d) 102, 92 P. (2d) 911, 125 A. L. R. 800, which was approved by this court in Smith v. Redwine, 26 Tenn. App. 104, 168 S. W. (2d) 185.

The cases above cited state the reasons for the conclusion therein. These reasons are supported by excellent authority. To my mind the reasoning is sound and should be adhered to.

This record overwhelmingly supports the finding of the Chancellor. His conclusions of law based thereon are sound. He should be affirmed.

I am not encumbering this record by a finding of fact or a recital of the various pleadings herein. This has been done in the majority opinion.

The undisputed facts are that the holder of the second mortgage herein released his trust deed before the H. O. L. C. made their loan thereon. He took an unsecured note therefor and after the H. O. L. C. had placed their trust deed of record he secured a trust deed for this unsecured note, placed it of record and now sues thereon.

The holder of the first mortgage had to reduce his mortgage considerably to enable the H. O. L. C. to make the loan. This act of the holder of the record mortgage was clearly a fraud on the government and should be repelled as contrary to public policy. Of course the right of the assignee of these record mortgage notes can rise no higher than that of the assignor.