CARL H. KRAETSCH, Appellant, v. C. B. STULL et ux., Appellees.

No. 47050.

OCTOBER 14, 1947.

Brammer, Brody, Charlton & Parker, John P. Harper, and Newton L. Margulies, all of Des Moines, for appellant.

Bump & Bump, of Des Moines, for appellees.

BLISS, J.—In 1925 plaintiff was the owner of the south 82½ feet of the north 100 feet of Lot 12, in Greenwood Park, now a part of the city of Des Moines. It is located at the southeast corner of the intersection of Ingersoll Avenue and Fortieth Street. At that time there was a frame two-story residence on the east 38½ feet of the property. In 1925 plaintiff built a brick apartment on the west 132 feet of the property. Back of the apartment and along the south line of the property he laid a concrete driveway, extending east from Fortieth Street 132 feet. It was about 10 feet wide at Fortieth Street and until it passed the east line of the apartment building, where it widened into a court about 30 feet square. Along the north side of the court plaintiff built four garages and along the east side three garages. All opened into the court. The north one of the three on the east side was attached to and partly built into the southwest corner of the frame residence. The sewer and water pipes which serviced the ·residence extended therefrom west under the driveway to the mains in Fortieth Street.

On September 18, 1929, plaintiff by written contract sold to the defendants the east 38½ (except 16x20 feet in the southwest corner) with the frame residence for $7,500, payable $75 monthly commencing October 1, 1929, and an additional $1,000 on January 1, 1930, with interest at six and seven per cent on deferred payments. Included in the sale was the garage attached to the house and an easement from the garage over the driveway to Fortieth Street, and also the west 3½ feet of the south 82½ feet of the north 100 feet of Lot 13, which strip abutted on the east line of the Stull property in Lot 12. Defendants took possession of the property. They contend that as a part of the consideration for the purchase plaintiff agreed to build a new roof on the house and to repair the chimney. He never did this, and defendants made the improvements, and in the counterclaim they ask damages for the cost of the improvements.

On September 26, 1931, plaintiff and wife executed a mortgage to the Bankers Life Company for $3,500 on the property sold to the defendants, who joined in the execution thereof. This mortgage covered and described defendants' easement over the driveway, and in connection therewith stated:

"With the right of ingress and egress of the same to and from the garage located on north 9 feet of the south 29 feet of the west 16 feet of the east 38½ feet of the south 82½ feet of the north 100 feet of said Lot 12."

No mention was made that the use of the easement was to be but temporary.

On August 13, 1925, plaintiff and wife executed to the Bankers Life Company a mortgage for $25,000 on all of said Lot 12 lying west of the part later sold to defendants. This mortgage was on the ground on which the apartment was built. The principal of this mortgage was reduced a number of times by payments and the maturity extended until it was paid in full and released on June 26, 1945.

We come now to the real controversy in this litigation. The parties are in direct contradiction on several matters, but where the truth lies is of little importance or materiality with respect to the decisive matters. They disagree as to which of them proposed taking advantage of the Home Owners' Loan Act of 1933, 12 U. S. C., chapter 12, section 1461 et seq. Plaintiff testified that defendants had difficulty in meeting the monthly payments on the purchase contract, and Mr. Stull solicited his co-operation in procuring a HOLC loan. Mr. Stull testified that about September 1, 1933, when no monthly payment was in default, plaintiff told him he needed a substantial sum of money, and suggested that the obligation owing him be refunded through the HOLC. Which of them was the instigator is of no consequence. They each participated in the refunding and its benefits. On February 10, 1934, defendants made the loan application. Plaintiff computed the amount of defendants' indebtedness, including interest and taxes, as $5,116.15. The HOLC appraised the property somewhat in excess of $4,000, which was insufficient to sustain a bond issue which would liquidate the

debt. Under the act it is optional with the creditor whether he will reduce the debt owing him to the amount of the bond issue. Unless he consents to so scale down his claim the HOLC is unable to aid the debtor. The instrument entitled "Mortgagee's Consent To Take Bonds" is a printed form, with certain blanks in it, which the HOLC furnishes. The one furnished in this case was as follows:

"Mortgagee's Consent To Take Bonds.

The undersigned is a holder of a first mortgage or other obligation, which constitutes a lien or claim on the title to the home property of *C. B. Stull* located at *3910      Ingersoll*

                                    (Number)  (Street)

*Des Moines   Iowa*  in the sum of *$5116.15* including unpaid

(City)     (State)

balance of principal and interest, to date.

Being informed that said owner has made application to Home Owners' Loan Corporation to refund his said indebtedness, the undersigned has considered the method of refunding mortgages provided in Home Owners' Loan Act of 1933, as passed by Congress and approved by the President, and the undersigned hereby consents if said refunding can be consummated, to accept in full settlement of the claim of the undersigned the sum of $4014.99, face value of the bonds of Home Owners' Loan Corporation, to be adjusted with not exceeding $25 cash and thereupon to release all the claim of the undersigned against said property. * * *

This, the *15* day of *March, 1934.*

                                   [Sgd]  *C. H. Kraetsch.*"

(The italicized words and figures indicate the blanks that were filled.)

Plaintiff admitted that he signed this "consent" but asserted that he never read what he signed, and that the blanks were not filled, and he trusted Mr. Stull to fill them. Just what insertions he thought would be placed in the blanks other than what were placed there is not explained. He knew the exact amount of the debt, and the amount of the appraisal, and he knew the bond issue would not exceed the appraisal, and that there would be a deficit between the issue and the amount of

the obligation. At all times he had insisted that he was merely accommodating the defendants and that he would take no loss. He knew when he signed the "consent" just what the deficit would be, because he and the defendants had previously agreed that they would take care of the deficit by giving him their note for $600 secured by a chattel mortgage on their household goods, and by releasing their driveway · easement in return for a $400 credit on their obligation. This release was typewritten, and was worded thus:

"Des Moines, Iowa
March 12, 1934

It is hereby mutually agreed by and between the parties hereto that Carl H. Kraetsch and Elizabeth E. Kraetsch, his wife, do hereby credit C. B. Stull and Lenore M. Stull, his wife, with the sum of Four Hundred Dollars on a contract of date Sept. 17, 1929 between these parties and for said credit C. B. Stull and Lenore M. Stull, his wife, hereby release from said contract the easement for driveway over the property of Carl H. Kraetsch and at the same time agree to allow Carl H. Kraetsch the use of the garage on his property to Oct. 1, 1934.

[Sgd]   C. B. Stull
[Sgd]   Lenore M. Stull."

No copies of the note for $600 and the chattel mortgage, executed by defendants to plaintiff at the time the easement release was executed, appear in the record. But both parties admit their execution and the payment of the chattel note in 1937.

On March 16, 1934, the $3,500 real estate mortgage heretofore mentioned was released of record. On March 14, 1934, plaintiff and wife executed a warranty deed of the property to C. B. Stull which had been purchased by him, described as hereinbefore set out. It made no mention of the driveway easement. It will be noted that all of these instruments were executed a day or two before plaintiff signed the "consent" on March 15, 1934, to take the bonds. To say that plaintiff did not know what he was signing, or what the paper contained, or that he was duped or misled into signing it, is the merest quibbling. He knew every fact and every amount stated therein. He knew

that the Home Owners' Loan Corporation was relying upon the statements contained in it to be the facts and the truth, and that it believed that he was accepting its bonds at their face value of $4,000 and $14.99 in cash in full settlement and payment of his claim. He also knew that as to the last-stated matter the "consent" was not true.

Mr. Stull testified that the consent paper was complete when plaintiff signed it; that he filled in the blanks in the body of it at the local office of the HOLC and then called plaintiff and he came over there and signed it. Stull in his testimony denied that plaintiff signed the consent in blank, saying: "I know Carl Kraetsch well enough to know he wouldn't sign anything in blank." Plaintiff is a member of a learned profession, experienced in business affairs, apparently successful therein. To sign a paper of its importance without reading it does not comport with sound reason or common practice. His testimony is not convincing.

I. If he did as he said he did he was very negligent, and he is bound by his conduct. Such was the holding in Bealkowski v. Powers, 310 Ill. App. 662, 35 N. E. 2d 386, against a creditor who made a similar contention in regard to signing a consent to take HOLC bonds.

In section 1467(a) of said Home Owners' Loan Act, 12 U. S. C., chapter 12, it is provided that:

"Whoever makes any statement, knowing it to be false, * * * for the purpose of influencing in any way the action of the Home Owners' Loan Corporation or the Board * * * upon any application * * * or loan, under this chapter * * * shall be punished by a fine of not more than $5,000, or by imprisonment for not more than two years, or both."

In United States v. Kreidler, D. C., Iowa, 11 F. Supp. 402, it was held that the mortgagee was guilty of making a false statement under the section just cited, where he concealed from the corporation the fact that he had an agreement with the home-owner mortgagor for the delivery of a second mortgage.

There is no evidence in the record that the HOLC approved of the chattel security or of the release of the easement or that

its board or anyone connected with the corporation had any knowledge of these matters. Both sides concede that there was no such approval or knowledge. Secrecy in obtaining such security or advantage is tantamount to fraud and violates the spirit and intent of chapter 12. Morrison v. Landers, 1943, 56 Cal. App. 2d 607, 133 P. 2d 34. As said in Federal Farm Mortgage Corp. v. Hatten, 1946, 210 La. 249, 26 So. 2d 735, the mere acceptance of an advantage in addition to the scale-down agreement, in itself, constitutes fraud.

II.   Section 1463(a) of the Act provides:

"The Board is hereby authorized and directed to create a corporation to be known as the Home Owners' Loan Corporation, which shall be an instrumentality of the United States, which shall have authority to sue and be sued in any court of competent jurisdiction, Federal or State, and which shall be under the direction of the Board and operated by it under such bylaws, rules, and regulations as it may prescribe for the accomplishment of the purposes and intent of this section. * * *

"(k)   The Board is authorized to make such bylaws, rules, and regulations, not inconsistent with the provisions of this section, as may be necessary for the proper conduct of the affairs of the Corporation."

"The power of Congress to provide in the act for the authority of the board of directors therein recited is well settled. U. S. v. Grimaud, 220 U. S. 506, 521, 31 S. Ct. 480, 55 L. Ed. 563, 569; U. S. v. Shreveport Grain & Elevator Co., 287 U. S. 77, 85, 53 S. Ct. 42, 77 L. Ed. 175." McAllister v. Drapeau, Cal. App., 85 P. 2d 523, 526.

III.   In the trial below no evidence was offered of any rule or regulation of the HOLC or its board. However, the Home Owners' Loan Act is one of force and application throughout the United States. By its express terms, the corporation organized thereunder and its board were authorized and directed to make such bylaws, rules, and regulations as might be necessary to effect the purposes of the act. Such orders and directives have the force and effect of the law. The courts take judicial notice thereof.

In 20 Am. Jur., Evidence, section 44, it is stated that:

"Orders and regulations by political branches of the government, within the scope of their authority, which have the same effect as law, will be judicially noticed by the courts, as, for example, quarantine rules to protect the health of society. * * * cognizance will be taken of the rules, orders, and decisions of the executive departments of the government. Thus, the regulations of the Post Office Department are part of the public records of which courts take judicial notice. The court's duty to take notice of statutory provisions includes the rules of the Home Owners' Loan Corporation authorized by the Home Owners' Loan Act." (Citing decisions.)

State courts take judicial notice of the rules of federal executive departments, the rules and regulations of federal boards and commissions, and of various departments of the state government. 31 C. J. S., Evidence, section 39, and cases cited.

In Cook v. Donner, 145 Kan. 674, 679, 66 P. 2d 587, 590, 110 A. L. R. 244, 248, the court said: "Of course, courts must take notice of statutory provisions, and that includes the rules of the Home Owners' Loan Corporation authorized by the act." See, also, State v. Gladstone, 112 Vt. 233, 22 A. 2d 490, 493. This court has recognized and followed this general rule. See State ex rel. Bierring v. Swearingen, 237 Iowa 1031, 1041, 22 N. W. 2d 809, 814, and authorities cited. See Evans v. Sheriden, December 3, 1944, 28 Tenn. App. 90, 186 S. W. 2d 911, 914, 915 (a divided court), for a holding to the contrary.

Shortly after the adoption of the act, the board of HOLC adopted such rules, regulations, and orders. On September 8, 1933, the following resolution was adopted:

"The Corporation has no means of preventing the home owner from undertaking to pay any indebtedness he may owe over and above that refunded by the Corporation and has no means of preventing his giving a second mortgage or other security for any such indebtedness. However, State Managers are directed, as a matter of policy in dealing with home owners, to decline to conclude a refunding of a portion of the indebtedness against the home where the home owner is proposing to give a second mortgage for any excess indebtedness he may owe

unless such second mortgage financing is so arranged that the home owner will have a reasonable probability of being able to carry his first mortgage to the Corporation and the second mortgage indebtedness.''

A resolution adopted on November 3, 1933, provided that after the HOLC secured a first lien the creditor was permitted to secure the excess indebtedness with a second lien, on this condition:

"However, such refunding will not be carried through unless such excess indebtedness is placed on a payment basis so that the home owner will have a reasonable opportunity to pay the same and meet his obligations to this Corporation.''

On January 9, 1934, this resolution was adopted:

"*Whereas* it is the policy of Home Owners' Loan Corporation to endeavor to make complete settlement in the refunding [of] home mortgage indebtedness in all cases where such is possible, and

"*Whereas* second mortgages for excess indebtedness over and above that which the Corporation can refund are permitted only in limited cases and then only on a basis so that the Home Owner will have reasonable probability of being able to pay his full obligation to the Corporation and meet the terms of such second mortgage indebtedness, and

"*Whereas* it is necessary for each case to be considered on its merits and in the light of all the circumstances of the property involved and the applicant, therefore [then are stated certain principles to be followed in administering the act].''

Later other rules and regulations, more stringent than those just stated, relating to the procuring of additional security by the creditor for the unrefunded excess indebtedness, were adopted. These may be found in citations hereinafter noted. The regulations above quoted in part were in effect at the time the act was applied in the case at bar. These particular regulations were construed, and such a secret lien was held void and unenforceable, in McAllister v. Drapeau, July 27, 1939, 14 Cal. 2d 102, 108, 109, 110, 92 P. 2d 911, 915, 916, 125 A. L. R. 800, 806. The court said:

"It is obvious, from a reading of the statute and the rules and regulations above quoted, that the main and controlling purpose of the act was to assist small home owners who, because of the then existing financial conditions, faced loss of their homes through inability to meet the charges due on mortgages on their home property. It is to be noted that the act places no compulsion, direct or indirect, on the creditor. The creditor had complete liberty of action. * * * It was contemplated, however, that many creditors would, and experience under the act proved that many did, accept a reduction in the amount of the existing loan in order to secure liquid assets such as bonds of the H.O.L.C. rather than foreclose on the property and have to hold it until conditions in the real estate market improved. The act provides that such reduction should be passed on to the home owner, the debtor."

After stating that circumstances might justify the giving of additional security to the creditor for the unrefunded debt, the opinion continues:

"Obviously, before these facts could be ascertained, a full disclosure of the amount and the terms of the proposed second lien would have to be made to the H.O.L.C. The securing of a second lien by the creditor without such disclosure is clearly in violation of the letter and spirit of the statute and regulations. This is demonstrated not only by the terms of the statute and the regulations, but also by the language of the agreement above quoted which all creditors were required to sign wherein the creditor represented and agreed that he was accepting the bonds 'in full settlement of the claim of the undersigned.'

"The obtaining of secret second liens by the creditor violates the basic public policy expressed in the act. The act was intended solely for the benefit of home owners who were in financial difficulties—no one else was eligible for its benefits. Any benefit to creditors was merely incidental. But if a creditor could lawfully exact a secret second lien from his debtor, in many cases this would confer the benefits of the act on the creditor rather than on the debtor. * * * The weakness of the instant case is that the existence of the second lien was kept

secret from the H.O.L.C. so that it was induced to make the loan in the belief its mortgage was the only lien against the property. The cases first above cited hold that such secrecy is tantamount to a fraud on the H.O.L.C.''

In McAllister v. Drapeau, just above, the court, following other decisions, stated that, disregarding the illegality feature, the agreement of the creditor to take the bonds from the HOLC, and their acceptance in full settlement, constituted ''an accord and satisfaction, a release or a novation.''

The holding of illegality and the reasons therefor as stated in McAllister v. Drapeau, supra, are found in other decisions in like situations. In Anderson v. Horst, July 15, 1938, 132 Pa. Super. 140, 143, 144, 200 A. 721, 722, 723 (the consent was signed October 7, 1933), the court said:

''The Home Owners Loan Corporation Act was one of the emergency measures enacted by Congress for the relief of distressed citizens. It was designed for the relief of home owners who were unable to carry or refund their mortgage indebtedness. It provided for the exchange of HOLC bonds in an amount not exceeding 80% of the appraised value of the mortgaged property for the mortgage and bond or other obligation, the Corporation to credit the difference to the home owner and thus reduce the amount owed by the home owner to that extent. It also provided for amortization of the loan by monthly payments * * * The refunding could not be accomplished without the consent of the mortgagee. But if he consented—and his consent was entirely optional (Thorne v. Edwards [147 Or. 443], 34 Pac. (2d) 640 * * *)—he must agree to accept said HOLC bonds in full settlement of his claim and release all his claim, or on request to assign the mortgage or other obligation without recourse to the Corporation. The bonds were guaranteed by the United States, and any loss sustained by the Corporation would be the loss of the United States which would have to be made up by general taxation. The purpose of the Act was, by agreement of the parties, to create a novation and reduce the principal of the mortgage debt and the interest, and extend the term of the mortgage. * * * It was not intended for the

relief of mortgagees, but they could secure its benefits if they were willing to reduce their claims and accept in settlement HOLC bonds for the reduced amount. * * * The purpose and intent was to relieve pressing conditions and give the home owner a chance to work out his salvation. This could not be accomplished if following the refunding, and as a condition for the mortgagee's consent to it, the home owner should be burdened by a reassumption of the debt, or part of it, which had been settled and released. The natural and probable effect of such an assumption would be to lessen the ability of the home owner to make his amortization payments and thus imperil the plan which Congress had devised for his relief, and load up the Corporation with foreclosed real estate, to the injury of the Government and its taxpayers.''

In Markowitz v. Berg, February 18, 1939, 125 N. J. Eq. 56, 58, 4 A. 2d 410, 411, 412, the court, speaking of the HOLC Act, said:

''The benefit, if any, to lienholders is incidental. In refinancing a home owner's obligations the H.O.L.C. seeks to readjust them in accordance with the ability of the home owner to make payments. The beneficial effect of such readjustment is nullified if a lienholder is permitted, without regulation, to defeat the purpose of the act. An arrangement such as here exacted by a lienholder tends to counteract the relief of the home owner sought by the act and is contrary to the purpose of the act and to the regulations adopted thereunder.''

The decision noted just above was affirmed by the Court of Errors and Appeals of New Jersey, January 25, 1940, in Markowitz v. Berg, 127 N. J. Eq. 90, 92, 11 A. 2d 107, 108, where the court, speaking of the secrecy of the agreement, said:

''In such circumstances, appellant [creditor] is precluded by estoppel in pais from now asserting the validity of the mortgage taken in violation of the policy of the Home Owners' Loan act. It is a corollary of the considerations of public policy adverted to that he was under a duty to advise the Home Owners' Loan Corporation of his disavowal of the agreement thus presumed to have been made on his behalf with the Corporation.

He knew that, in the absence of such notice, the Corporation would consummate the loan on the supposition that the judgment debt would be in fact deemed satisfied in accordance with the agreement and that no part of the balance would continue as a lien against the lands in the form of a subsequent mortgage. His ignorance of his obligation does not serve to excuse him from the consequences of his inaction.''

In Cannon v. Blake, September 5, 1944, 353 Mo. 294, 298, 182 S. W. 2d 303, 306, the second note and deed of trust secured by the creditor were canceled. Its existence had not been disclosed to the HOLC. The court said:

''Now, H.O.L.C. has the duty of administering the Act in accordance with its purpose and intent, and so has the responsibility of determining the questions of the home owner's worthiness of relief, and the soundness of the refunding of his indebtedness. The lienholder knows the end to which H.O.L.C. is acting in the exercise of its duty and responsibility, and, if he elects to participate in the H.O.L.C. refunding and agrees to take H.O.L.C. bonds 'in full settlement' of his claim, it would seem that he should disclose to H.O.L.C., prior to the closing of its loan, the amount and the terms of any exaction he has made, or will make, relative to that portion of his lien which H.O.L.C. cannot refund, for such an exaction would affect the question of the soundness of the refunding of the home owner's indebtedness. * * * The Act purposed to enable the owner to satisfy the liens on his home, not to effect the postponement of the foreclosure of them. * * * There could be no difference in the effect of the second lien, as it bears upon the purpose of the legislation, whether the execution of the lien was agreed upon prior, or subsequently, to the closing of the H.O.L.C. loan.''

In Williston Sav. & L. Assn. v. Kellar, February 28, 1946, 74 N. D. 338, 351, 22 N. W. 2d 30, 37, an opinion in which the second mortgage was upheld on appeal because the HOLC refinanced the debtor's mortgage with full knowledge of the debtor's agreement to give the creditor a second mortgage not exceeding the difference between the face value of the corporate bonds and the amount of the debt, in speaking of a secret agree-

ment and the violation of the penal provision, section 1467(a), the court said:

"With reference to the second provision under consideration there seems to be practical unanimity to the effect that this provision, being penal in its nature, is to be construed as rendering void any secret agreement between creditor and debtor which would preserve to the creditor any portion of his debt specified in the 'Consent' over and above the face value of the bonds. The purpose of the Act is primarily to aid the debtor, to substitute one creditor for another, if possible, so that all relations to the former creditor are discharged in an entirety so far as the debt is concerned. The Loan Corporation would not ordinarily enter into any such deal for substitution of creditors if there would be no benefit to the debtor, and the benefit to the debtor consists in reducing the amount of the debt if it can be done as well as giving him more favorable terms. It would be useless for the Loan Corporation to refinance the debtor if it was merely giving the creditor additional security. The purpose is not to put the creditor in a better position and the Loan Corporation had the sole right to determine whether it would enter into any deal or arrangement whatever. Hence any false statement made by the creditor, knowing it to be false, and for the purpose of having the Loan Corporation enter into a deal ostensibly to wipe out indebtedness to the creditor yet preserving part, would be a fraud upon the Loan Corporation. It would be an inducing cause for the Loan Corporation to deliver bonds. When the creditor states, 'All my indebtedness is to be extinguished,' and thus induces the Loan Corporation to act, then that which the creditor should have done will be considered as having been done. Hence there would be no consideration for any new debt or mortgage."

Our research confirms the statement of the Supreme Court of Pennsylvania, in Walker v. Oakley, May 24, 1943, 347 Pa. 405, 407, 32 A. 2d 563, 564, to wit:

"The result is that, with almost complete unanimity, the courts have held that if an agreement for such a lien was not brought to the knowledge of the Corporation, whether because

of a deliberate intent to preserve secrecy or because of the mortgagee's ignorance of the law, and therefore the approval of the Corporation was not obtained, the agreement is void and unenforceable."

Some of the many decisions which have so held are here noted. Chaves County Bldg. & L. Assn. v. Hodges, 40 N. M. 326, 59 P. 2d 671; Cook v. Donner, supra, 145 Kan. 674, 66 P. 2d 587, 110 A. L. R. 244; Stager v. Junker, 14 N. J. Misc. 913, 188 A. 440, 441; F. S. T. Corporation v. Onorato, 139 N. J. Eq. 195, 50 A. 2d 467, 471, 472, where the court said:

"An insurmountable barrier to the relief which the complainant seeks must be recognized in the fact and circumstance that the building and loan association agreed in writing, and without reservation, to accept bonds in the amount of $2481.48 'In Full Payment and Discharge of Said Indebtedness.'"

See, also, Home Owners Loan Corp. v. Aiello, 62 R. I. 353, 5 A. 2d 649; Watters v. Harris, 147 Neb. 1081, 26 N. W. 2d 182, 184, 185; Fender v. McCain, 144 Neb. 58, 12 N. W. 2d 541; Smith v. Redwine, 26 Tenn. App. 104, 168 S. W. 2d 185, 186; Gordon v. Young, 146 Neb. 578, 20 N. W. 2d 616, 620; Jessewich v. Abbene, 154 Misc. 768, 277 N. Y. Supp. 599; Dayton Mtg. & Inv. Co. v. Theis, 62 Ohio App. 169, 23 N. E. 2d 511; Meek v. Wilson, 283 Mich. 679, 278 N. W. 731; Miners Sav. Bk. v. Hart, 349 Pa. 468, 37 A. 2d 570; Council v. Cohen, 303 Mass. 348, 21 N. E. 2d 967; Pye v. Grunert, 201 Minn. 191, 275 N. W. 615, 276 N. W. 221; Empire Mtg. & Inv. Co. v. Bratton, 198 Ga. 865, 32 S. E. 2d 907, 909; Johnson v. Matthews, 301 Ill. App. 295, 22 N. E. 2d 772; First Citizens Bk. & Tr. Co. v. Speaker, 250 App. Div. 824, 294 N. Y. Supp. 737; Local Fed. Sav. & L. Assn. v. Harris, 188 Okla. 214, 107 P. 2d 1012; Kudack v. Port Washington Nat. Bk. & Tr. Co., 32 N. Y. S. 2d 203; Neavitt v. Upp, 57 Ariz. 445, 114 P. 2d 900; Dime Bk. & Tr. Co. v. Walsh, 143 Pa. Super. 189, 17 A. 2d 728, 730, 731; Weber v. Sternad, 69 Ohio App. 258, 39 N. E. 2d 623, affirmed 140 Ohio St. 253, 43 N. E. 2d 227; Haroldsen v. Yeates, 104 Utah 398, 140 P. 2d 350; Southwestern Sav. & L. Co. v. Di Luzio, 1945, Ohio App., 65 N. E. 2d 148. See, also, 110 A. L. R.

250, 121 A. L. R. 119, 125 A. L. R. 810; 38 Mich. L. Rev. 508; 52 Harvard L. Rev. 842; 28 Cal. L. Rev. 232.

The Emergency Farm Mortgage Act of 1933, 12 U. S. C., chapter 7, section 1061 et seq. (Federal Farm Loan Act, section 641 et seq.), chapter 2, section 32, was enacted to give to distressed farm owners the relief accorded to home owners by the Home Owners' Loan Act. McCrory v. Smeltzer, 132 Tex. 383, 124 S. W. 2d 336, 339, 340. The decisions thereunder, in like situations, accord with those just above cited. Under the former, violation of scale-down agreements between a creditor and a farm debtor made at the behest of the Federal Land Bank invalidates obligations thereunder contrary to the agreement. The reason for the invalidation being that such practices would defeat the purpose of the act. It is thus stated in McGinnis v. Rolf, 1945, Mo. App., 189 S. W. 2d 456, 463:

"The purpose of this law has been held to be twofold. First, it is the purpose of the Federal Land Bank to protect its own financial position as a new creditor of the farmer under such 'scale down' agreements and not to permit the precarious financial condition of credit structure being dealt with to be continued or re-established by obligations of the borrower of which the bank has no knowledge. Secondly, it is the purpose of the act to make it possible for the farmer to continue operations on his farm and to obtain real benefits from the 'scale down' agreement and loan."

Other decisions holding such secret creditor-farmer agreements to be void and unenforceable are: International Harvester Co. v. Young, 288 Mich. 436, 285 N. W. 12–14; May v. Whitbeck, 111 Mont. 568, 113 P. 2d 332; Kniefel v. Keller, 207 Minn. 109, 290 N. W. 218; Murphy v. Plains State Bk., 157 Kan. 530, 142 P. 2d 733; Oregon & Western Colonization Co. v. Johnson, 164 Or. 517, 102 P. 2d 928; Ellwood v. Lancaster, Tex. Civ. App., 157 S. W. 2d 973; Knox v. Geisler, 192 Okla. 543, 138 P. 2d 811, 147 A. L. R. 740, 743; Federal Land Bk. v. Koslofsky, 67 N. D. 322, 271 N. W. 907; McCrory v. Smeltzer, supra, 132 Tex. 383, 124 S. W. 2d 336; Arndt v. Bank of America, D. C., Cal., 48 F. Supp. 961; Pries v. Hurning, 218 Minn. 189, 15 N. W. 2d 515, 517, 518.

■ IV.   Under the record the plaintiff and defendants were in pari delicto, and as found and decreed by the court none of them was entitled to any relief asked.  Of a like situation, the court, in Anderson v. Horst, supra, 132 Pa. Super. 140, 145, 200 A. 721, 723, said:

"We recognize that the appellants [debtors] here were parties to the unlawful agreement no less than the mortgagee, and, because of that, we will not permit them to use our courts to recover back payments made by them pursuant to it; but neither will we allow our courts to be used by the mortgagee as an instrument to enforce the illegal agreement, but will set it aside as contrary to public policy, when the help of the courts is sought to carry it into effect.  See Restatement—Contracts, sec. 512; Miller v. Ammon, 145 U. S. 421 [12 S. Ct. 884, 36 L. Ed. 759]."

Plaintiff states two propositions on which he relies for reversal, namely, the release of the easement was not invalidated by defendants' subsequently borrowing from the HOLC, and he was not in pari delicto with defendants.

On the first proposition he cites a statement from VI Williston on Contracts, Rev. Ed., 1938, section 1752, to the effect that a contract collaterally and remotely connected with an illegal act is valid if it rests on independent consideration and the case can be established without relying on the unlawful transaction.  We have no quarrel with this rule of law, but it has no application.  The facts before us do not permit the plaintiff to take advantage of it.  The refunding transaction was a three-party one between plaintiff, the defendants, and the HOLC. Its purpose was to eliminate plaintiff as the creditor by paying defendants' debt to him with HOLC bonds, and substituting in his stead, as the creditor, the HOLC, holding a new note and mortgage executed by defendants.  But plaintiff refused to be a party to this unless he received as additional consideration defendants' $600 note and chattel security and the release of the easement.  The last two transactions were not collateral and remote from the principal transaction.  Plaintiff made them integral and essential parts of the transaction by insisting that

defendants perform them as conditions to his participation in the refunding transaction. The language of the Pennsylvania Supreme Court, in Miners Sav. Bk. v. Hart, supra, May 22, 1944, 349 Pa. 468, 474, 37 A. 2d 570, 572, is quite apropos, to wit:

"The gist of plaintiff's contention is that the Hart mortgage to the Bank and the Denee mortgage to the Harts were two distinct and independent transactions and that therefore the validity of the Hart mortgage was not impaired by the invalidity of the Denee mortgage. It is true that the two mortgages were written on separate pieces of paper, but the agreement which gave them their twin birth—or, more accurately, created the one and revived the other—constituted a unitary plan. It would be unrealistic to regard the transaction in its entirety as other than an integrated one or the mortgages as other than the component and inseparable parts of an illegal device."

That case was of the HOLC type now before this court.

Plaintiff says little or nothing about the chattel mortgage and note. He apparently recognized that as a debt burden of defendants, in addition to their HOLC obligation, and as an obligation that was void and would have been unenforceable. As an added debt it impaired their worth as debtors to the HOLC and by its amount it defeated the purpose and policy of the act to lessen the indebtedness of defendants. The release of the easement was a part of the same illegal transaction and was void because thereof. Plaintiff argues that the release did not place an additional burden upon defendants. It did, however, lessen the value of the security given to the HOLC. Defendants had enjoyed and used the easement continuously from October 1, 1929. They were using it at the time of the trial, and at the time the HOLC appraised the property and determined the amount of its bond issue. The complete transaction should have been made known to the HOLC so that it could act advisedly in administering the act, and in protecting its financial structure. By failing to disclose these matters to the HOLC plaintiff gained additional security without reduction of his assets, while defendants received no reduction of their

debt and no benefit except its amortization. We find no merit in the first proposition relied on for reversal.

V. Plaintiff in urging the second proposition impliedly concedes that he participated with defendants in a wrong but contends that his was the lesser guilt. He seems to confess and avoid. His ground therefor is that Mr. Stull agreed to look after the transaction and was his attorney in the matter. In fact, he relies upon a continuous relation of client and attorney. He and his wife testified that in 1933 Stull collected some rent for them and looked up some estate reports in the courthouse, and in 1937, long after the HOLC transaction, he collected some more rent. In the refunding transaction Stull was not representing plaintiff as an attorney against a third party, but he and the plaintiff were in an adversary position, and were dealing at arms' length. The trial court, which heard and saw the parties, must have given no weight to plaintiff's contention, as it found them equally guilty. We have no disposition to disturb this finding.

In the court's findings it expressly found that the defendants were not entitled, under the allegations of their answer, to recover the money they had paid plaintiff in satisfaction of their $600 promissory note, the payment of which was secured by mortgage on their household goods. In the decree there is a specific order that the claim of defendants in their counterclaim for damages for breach of plaintiff's agreement to put a new roof on the house and to repair the chimney was denied. But there is no mention of a denial of recovery for the payments on the chattel note. This was no doubt an oversight. It is our conclusion that there should be a specific denial of this claim in the decree. The district court is ordered to make this modification of and addition to the decree.

In all other respects the decree is affirmed, and as so modified it is—Affirmed.

OLIVER, C. J., and HALE, GARFIELD, SMITH, MULRONEY, MANTZ, and HAYS, JJ., concur.