**Milton LINN, Plaintiff,**

v.

**ULA URANIUM COMPANY, Inc., a corporation, and Radium King Mines, Inc., a corporation, Defendants.**

**Hersey W. Young, Jr., Intervenor.**

**No. C-92-57.**

United States District Court
D. Utah,
Central Division.

June 3, 1958.

246

Irwin Arnovitz and Alvin I. Smith, Salt Lake City, Utah, for plaintiff.

Allen E. Mecham of Clyde & Mecham, Salt Lake City, Utah, for Ula Uranium Co. and Hersey W. Young, Jr.

David L. McKay of McKay, Burton, McMillan & Richards, Salt Lake City, Utah, for Radium King Mines, Inc.

CHRISTENSON, District Judge.

Plaintiff brought action against the corporate defendants, respectively lessee and operator of certain mining claims, to enforce an assignment in his favor from Hersey W. Young, Jr., intervenor, of a portion of the latter's over-riding royalty interest in the claims. The case now turns on an issue of fact and an issue of law which were not suggested by the original complaint but arise from the answer of the defendants and the complaint in intervention. These best can be understood by a brief reference at the outset to the following circumstances:

In November, 1953, the plaintiff Linn paid $25,000 in cash to the then President of Guatemala in return for his appointment as agent to handle "all matters, leases or grants pertaining to all

oil or gas rights to the Government of Guatemala." Young theretofore had orally agreed to reimburse Linn for this disbursement, funds for which were furnished by a corporation under Linn's control. After the appointment was thus procured, but no doubt in line with a prior general understanding, Linn, as agent for another corporation which he controlled, agreed with Young and an associate, Allen Wright, that they would divide equally among themselves half of the profits anticipated from operations connected with said appointment, the other half to be reserved for the man "the identity of whom is well known to the signatories." After the payment to the President was made and Linn had conferred with Young in the United States, there came into existence a promissory note and a collateral security agreement both dated November 12, 1954, which Linn says Young signed in recognition of his obligation to reimburse Linn for the $25,000 payment, and which Young denies that he knowingly executed. Be this as it may, there is no question between the parties that on or about November 17, 1954 Young executed and delivered to Linn the assignment of a portion of his royalty interest in the mining claims.

Whether the assignment was to secure the $25,000 note or was intended solely to place Linn in a position to procure from third parties a loan for Young's other purposes, is the crucial question of fact in this case.

The Court finds:

■ 1. Plaintiff is a resident and citizen of the State of Florida, and both defendants and Hersey W. Young, Jr., intervening defendant, are residents and citizens of the State of Colorado. This Court has jurisdiction by reason of the fact that there is diversity of citizenship between the parties plaintiff and defendants and the intervenor, and plaintiff's claim is in excess of $3,000, exclusive of interest and costs.

2. In June, 1954, the intervening defendant, Hersey W. Young, Jr., obtained a mining lease on mining claims situate in San Juan County, Utah, designated as "Hersey Nos. 1 to 34" and on other claims not involved in this case. On July 5, 1954, Young, as sub-lessor, entered into a sub-lease of these claims with one A. W. Hutchings, retaining a twenty-two and one-half percent overriding royalty of the value of all ores, metals and minerals mined and sold from the said claims, and twenty-two and one-half percent of any bonus paid for the production of ores by the Atomic Energy Commission. Hutchings assigned his interest under the said lease to Ula Uranium Company, Inc. and entered into a working agreement with Radium King Mines, Inc., the other defendant, whereby the latter company became the operator of the mines on said claims.

3. Relying upon the assignment in dispute plaintiff has made demand upon both defendants for five percent of the value of ores mined and sold from the said mining claims and five percent of any bonus paid for the production of such ores by the Atomic Energy Commission.

4. The defendants have refused to comply with, or recognize, plaintiff's demand because of their contention that there was no legal consideration for the assignment and that in any event, the assignment conveyed only five percent of Young's retained percentage of twenty-two and one-half percent rather than five percent of the entire production.

5. Five percent of the ore mined from the said claims from November 19, 1956, the date of the first shipment, to November 19, 1957, including bonus, was of the value of $28,293.39. Five percent of twenty-two and one-half percent of such ores for the same period, including bonus, was of the value of $6,366.24.

6. On November 2, 1954, at Guatemala City, Guatemala, Castillo Armas, President of Guatemala, executed an appointment of plaintiff Linn as his agent to handle oil and gas rights on behalf of

the Government of Guatemala[1]. This document was delivered on or about the date it bears or on November 9, 1954 by the President of Guatemala to the plaintiff with the tacit, if not the express, understanding that Linn would pay to him in consideration for such appointment the sum of $25,000.

7. Linn theretofore had made arrangements with Modern Investment Service Corporation, which he controlled, to advance the $25,000 for the purpose indicated, which advance was effectuated through two checks bearing dates of November 5, 1954 and November 9, 1954 in the sums of $14,850 and $10,150, respectively.

8. Prior to the payment to Armas of the $25,000 thus procured by Linn, Linn requested and secured an oral agreement from the intervenor Young to reimburse him therefor; that notwithstanding said agreement of reimbursement Linn continued to be interested along with Young and his associate, Allen Wright, in the said appointment as a means of making personal profit.

9. At about the same time Linn received the agreement of reimbursement from Young, and unknown to Young, Linn also procured a check for $12,500 from one Robert L. Morris as further assurance for his reimbursement on which check he later brought suit against Morris and procured judgment in the State of Louisiana and on which judgment he subsequently collected approximately $1,200 [2].

10. On November 12, 1954, a memorandum agreement was executed by the intervenor Hersey W. Young, Jr., by Allen Wright for Allen Wright and Associates, and by Milton Linn as agent for Equitable Mortgage and Insurance Co., Inc., agreeing to the division of profits received from the Guatemalan exploitation in the proportion above indicated [3]. This agreement was executed

---

[1]. "* * * I, Castillo Armas, President of Guatemala, duly qualified by the Government of Guatemala, hereby appoint Mr. Milton Linn as my true and lawful agent, to handle all matters, leases or grants pertaining to all oil and gas rights to the Government of Guatemala. /s/ Castillo Armas, President of Guatemala."

(Then follows handwriting in Spanish, a translation being: "Note: I understand this credential means that the exploitation of the petroleum will be made in accordance with the law that the Government is going to issue.")

[2]. In his complaint in that suit Linn alleged in effect that the $12,500 check was given to him in consideration for cash which he advanced to Morris but it appears probable that the check was given as an additional security to Linn that the $25,000 he paid to Armas would be returned to him by Young.

[3]. "* * * Whereas, Milton Linn received a letter dated November 2, 1954 appointing Milton Linn the true and lawful Agent to handle all matters, leases and grants pertaining to all oil and gas rights for the Government of Guatemala and signed by the President of Guatemala.

"In consideration of the sum of Twenty Five Thousand ($25,000) U. S. Dollars paid by Equitable Mortgage and Insurance Co., Inc., who advanced the same to a certain party the identity of whom is well known to the signatories to this agreement, it is hereby agreed as follows:

"1. That all parties hereto shall undertake the securing of contracts and/or the negotiations thereof for the granting of concessions for oil and gas rights in Guatemala, which shall be governed by, and construed in accordance with, the laws of Guatemala, which also shall be subject to the approval of the President of Guatemala, and which shall be presented to the President of Guatemala with bona fide dollar (U. S.) deposits satisfactory to all parties.

"2. It is further agreed that all moneys and/or other considerations received from any source whatsoever shall be divided as follows:

Fifty percent (50%) to a certain party the identity of whom is well known to the signatories to this agreement;

Sixteen and two-thirds percent (16⅔%) to Hersey Young;

Sixteen and two-thirds percent (16⅔%) to Allen Wright and Associates;

Sixteen and two-thirds percent (16⅔%) to Equitable Mortgage and Insurance Co., Inc. * * *"

pursuant to a general understanding between the parties which existed on November 9, 1954 and at the time the payment of $25,000 was made to Armas.

11. There has been received in evidence as plaintiff's exhibit No. 1 a promissory note dated at Miami Beach, Florida, November 12, 1954, purportedly signed by Hersey W. Young, Jr., in favor of Milton Linn in the sum of $25,000.00. Linn testified that this note, together with a collateral security agreement apparently written on the same typewriter, was executed by Young in his presence. Young's testimony was that while the signature appeared to be his, he had no recollection of ever signing the note and that he never had any understanding that a note would be signed in consideration of his promise to pay Linn the $25,000. The latter position is thrown into question by a memorandum in Young's handwriting (plaintiff's exhibit No. 8) making general reference to such a note; and Young's unwillingness to specifically deny that the signature on the note was his further weakens this position. Linn's testimony concerning the circumstances of the note and related matters was also unconvincing and I am of the impression that neither has fully and accurately revealed all of the pertinent facts. Notwithstanding this, on the present state of the record, were it necessary to make a finding concerning the genuineness of the note, it would have to be against Young's contention, since on the issue he had the burden of proof.

12. On November 17, 1954 the assignment upon which plaintiff's action is based was signed by Hersey W. Young, Jr., in favor of Milton Linn. It was acknowledged by Young on November 18, 1954 before a notary public in the County of Bexar, State of Texas, and was filed for record in the county wherein the claims were located on December 3, 1954 [4]. On December 18, 1954 a power of attorney also was signed by Young in favor of Linn " * * * to negotiate, assign, transfer or pledge five percent (5%) of the over-riding royalty that is provided for in the sub-lease dated July 5, 1954 by and between Hersey W. Young, Jr., and A. W. Hutchings for the purpose of acquiring a loan." (Defendants' exhibit C).

13. The said assignment was given to Linn for the purpose of Linn's attempt to obtain for Young a loan from third parties, the proceeds of said loan to be used by Young for his own purposes. Said assignment was not intended by Young to be security for the payment of the purported note or for any obligation of Young to Linn and that if Linn at the time so intended said assignment, it was an undisclosed intention upon his part [5].

4. " * * * That I, Hersey W. Young, Jr., 3084 Forest St. of Denver, Colorado, Denver County, Colorado, for and in consideration of the sum of Ten Dollars ($10.00) to me in hand paid by Milton Linn, the receipt of which is hereby acknowledged, have bargained, sold and assigned, and by these presents do grant, bargain, sell, assign and transfer unto the said Milton Linn, his executors, administrators and assigns, certain five percent (5%) of the overriding royalty as provided for in the sub-lease dated July 5, 1954 by and between Hersey W. Young, Jr. and A. W. Hutchings (copy attached) together with the obligations therein described, and the money due or to become due thereon, with interest. * * *"

5. On December 20, 1954, Linn, for Modern Investment Service Corporation, returned other papers which he had been given for the purpose of obtaining the loan, stating among other things:

"We trust that you will find all these papers in order and as soon as you are successful in negotiating a loan which is satisfactory to you, please advise the bank or bankers to get in touch with us directly and we will make arrangements for reassignment of the Assignment made to me on November 17, 1954 upon payment to us.

"Hersey, I want to assure you that every effort has been made at this end to negotiate a loan for you. However, to give you a brief review, we were unable to do anything until we received the recorded Assignment, which only arrived last week. After many discussions with our bankers, they felt that they required a great deal more information, which I outlined to you on the telephone on Friday, December 17th."

14. While Linn still retained the assignment, with the concurrence of his attorney and Allen Wright and at the suggestion of a friend of Armas' who was concerned with the embarrassment which could be caused to the Guatemalan government by reason of the appointment's being outstanding, Linn delivered the original to a courier for the President. He did so with the understanding that some suitable arrangement might be made for him thereafter to participate in the exploitation of oil in Guatemala. He subsequently made inquiry indirectly concerning the possibility of obtaining the return of his $25,000 from the President. He thereafter received from Allen Wright, whose relations with Young in the meantime had ruptured, a one-twentieth interest in a Guatemalan corporation, this interest constituting five percent (5%) of the total outstanding capital stock, together with a one-twentieth interest in an over-riding royalty of a one-sixteenth of all petroleum or minerals produced under a concession granted by the country of Guatemala. Young had no advance knowledge of, nor did he consent to, the return of the letter of appointment and he had no prior knowledge of the delivery to Linn of the interest in the Guatemalan corporation.

■ I am of the opinion that the assignment upon which plaintiff brings his action is not supported by any consideration. It was delivered to Linn solely for the purpose of procuring a loan which did not materialize. It is for this reason, invalid and unenforceable.

If the Court should be mistaken in its finding of the purpose of the assignment there would still remain in my opinion an insuperable obstacle to Linn's success in this action.

■ There may be understandable differences of opinion concerning the term which could be applied most accurately to the payment made by him to President Armas. Linn declined to attach to it the connotation of the five-letter word that likely would be used to describe the delivery of cash to an official in this country under analogous circumstances. However the transaction is termed and considering to the full possible extent differences in the mores and attitudes of the respective peoples, I am of the opinion that this was not such a payment as to provide legal consideration for an agreement for reimbursement enforceable in the courts of the United States.

The plaintiff makes a point of the fact that Armas in his own handwriting qualified the appointment of Linn by the understanding that the exploitation would be in accordance with the law to be thereafter issued by the Government of Guatemala. This argument ignores the principal vice of the transaction which was not the manner in which Linn thereafter might exercise the appointment, since that was speculative and may well have turned out to be consistent with future laws. What vitiates it, and the point directly concerned in this lawsuit, is its patent purpose of influencing the head of a government to make an appointment of this nature. No other reason or occasion for the payment has been suggested.

■ Without having presented evidence on the subject, plaintiff further insists that existing laws and customs in Guatemala are different from those in this country and that, be that as it may, there is nothing to demonstrate the impropriety of the transaction there.

The case of Oscanyan v. Arms Co., 103 U.S. 261, 26 L.Ed. 539, contains direct answers to the latter and several related problems with which we are confronted. This decision has since been cited fre-

This letter apparently is the first time Linn claimed in any writing that the assignment was for the purpose of securing a debt already owing to him. On December 2, 1954, he had asked Young to certify that there was no conflicting assignment, ostensibly in order to facilitate his obtaining a loan for Young (see defendants' exhibit I). At no place in the subsequent correspondence between Linn and Young or their representatives did Linn specifically mention that the assignment was being held to secure the specific note in question.

quently but has never been qualified or overruled by the Supreme Court. It involved an action to recover the sum of $136,000 alleged to have been due on a contract with the defendant manufacturer as commission on sales of firearms to the Turkish government effected through plaintiff's influence while he was its consul-general at the Port of New York. Mr. Justice Field, writing for a unanimous court, rejected the contentions that the illegality of consideration asserted by the defendant at the trial could not be considered because it had not been pleaded, that the defense was not sufficient in law because the position of consul-general was an honorary one without compensation other than through such commissions, and that officials of the Turkish government considered it proper to receive them, the Turkish government itself not objecting.

It is said (at pages 268–269 of 103 U.S.):

"* * * Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation.' See also Holman v. Johnson, 1 Cowp. 341."

Further, (at pages 276–277 of 103 U.S.):

"* * * The courts of the United States will not lend their aid to collect compensation for services of this nature; nor does it make any difference that the Turkish government did not object to the plaintiff's taking commission on such contracts, which counsel contended we must consider as admitted together with the rest of the opening statement. We may doubt whether we are com-

pelled to take as correct, with the facts mentioned touching the contract in court, his statement of the law or customs of other countries. But admitting this to be otherwise, and that the Turkish government was willing that its officers should be allowed to take commissions on contracts obtained for it by their influence, that is no reason why the courts of the United States should enforce them. Contracts permissible by other countries are not enforceable in our courts, if they contravene our laws, our morality, or our policy. The contract in suit was made in this country, and its validity must be determined by our laws. But had it been made in Turkey, and were it valid there, it would meet with the same reprobation when brought before our courts for enforcement."

And the opinion concludes (at pages 277–278, of 103 U.S.):

"Among such obnoxious contracts must be included all such as have for their object the control of public agents by considerations conflicting with their duty and fidelity to their principals. A contract to bribe or corruptly influence officers of a foreign government will not be enforced in the courts of this country,—not from any consideration of the interests of that government or any regard for its policy, but from the inherent viciousness of the transaction, its repugnance to our morality, and the pernicious effect which its enforcement by our courts would have upon our people. Hope v. Hope, 8 DeG., M. & G. 731; Watson v. Murray, 23 N.J.Eq. 257.

"In any view of the contract here, whether it would be valid or invalid according to Turkish law and customs, it is intrinsically so vicious in its character and tendency, and so repugnant to all our notions of right and morality, that it can have no countenance in the courts of the United States.

"Our conclusion, therefore, is that the third position of the plaintiff is not well taken.

"It follows that the judgment of the court below must be affirmed; and it is so ordered."

These authoritative views firmly expressed leave for further consideration, I think, only whether unrealized security for the executory agreement to reimburse such a payment is in any better position than an oral agreement to make the payment.

 Before delivering the cash in consideration of the preferential appointment from which he expected personal benefit, Linn obtained an oral agreement that Young should reimburse him and in reliance upon such agreement Linn made the payment. Such a contract clearly would be unenforceable as against public policy. If this were not so the law would directly encourage and facilitate the very transaction that under well-settled principles its every inclination is to discourage and prevent. In my view, it does not make such an agreement any more enforceable that it was later reduced to a promissory note, secured by an assignment of a royalty interest. The note, not being in the hands of an innocent party, is no better than the agreement upon which it is based and the security for the note has no greater validity than the note itself.

Merely carrying into effect in a new form an invalid contract will not relieve it from the consequences of the illegality of the original consideration. May v. Whitbeck, 111 Mont. 568, 113 P.2d 332. Cited in that case by the Montana court and particularly appropriate here is the following quotation from 17 C.J.S. Contracts § 285:

"A contract is rendered illegal by a prior illegal contract with which it is connected and out of which it immediately grows. Where a contract grows immediately out of, and is connected with, a prior illegal contract, the illegality of such prior contract will enter into the new contract and render it illegal; and the rule has been broadly laid down that, if the connection between the original illegal contract and the new contract can be traced, and that if the latter is connected with, and grows out of, the former, no matter how many times and in how many different forms it may be renewed it cannot form the basis of a recovery. So, every new agreement in furtherance of, or for the purpose of carrying into effect, any of the unexecuted provisions of a previous illegal agreement is likewise illegal and void, as is a contract the performance of which depends on performance of a prior invalid contract."

The plaintiff on this phase of the case rests major reliance upon Buchhalter v. Rude, 10 Cir., 1951, 54 F.2d 834. He says that to deny relief to the plaintiff would not leave the parties where they were but would permit one wrong-doer in pari delicto with another to unjustly retain a benefit at the expense of the latter, contrary to the teachings of the case cited. I have no question concerning either the binding effect or the sound reasoning of that case under circumstances to which it is applicable. It is not here in point, but the principles there applied are not inconsistent with the result in this case.

Irrespective of the form in which he seeks to accomplish it by this action, Linn, in effect, asks the Court to recognize and enforce a note to which Young's continuing executory contract for reimbursement was allegedly reduced by granting him affirmative relief with respect to its security both as against the corporate defendants and as against Young. Linn made the payment for his personal gain, as well as in reliance upon the agreement for reimbursement. At the same time he secretly took other security and later collected a substantial sum by virtue of it from a third party; he then returned the formal indicia of his appointment which represented the reason for the payment and for its alleged security, all without the knowledge

or consent of Young, who, he now asserts, should continue primarily responsible for the full repayment of its consideration. Moreover, Linn, himself, endeavored to obtain a return of the money by Armas after his surrender of the letter of appointment. Later, in at least partial consideration for such return he received an assignment of interest in stock of a Guatemalan corporation of at least speculative value.

If Linn were permitted to recover here the Court would not only be making him whole for his improper payment, but of necessity would have to permit him to retain other benefits which he got from the transaction, the value of which the evidence leaves to conjecture. Young or his assignee, on the other hand, is seeking only to retain the royalty interest which he lawfully acquired theretofore without reference to any illegal transaction. To permit him to do so would not be inconsistent with public policy; to grant Linn the relief he asks as plaintiff would be contrary to public policy. Linn's effort to equate the situation of the parties here with the position of those in the Buchhalter case is not convincing.

On the two grounds stated, either one of which is sufficient to require this disposition, it is concluded that plaintiff is not entitled to relief.

It would not add anything to further explore the genuineness of the note itself, the resolution of which question would not alter the result, nor is it necessary for the Court to determine the extent of the interest covered by the assignment because the foregoing conclusions render the point moot. Another defense, that is, that the note was payable to Linn whereas the cash for the purpose of the Armas payment was advanced by Modern Investment Service Corporation or by Equitable Mortgage and Insurance Co., Inc., need not be explored. The Court has already permitted a disclaimer to be filed by these corporations in favor of Linn and would not be disposed if it could avoid it—and I think it could—to have plaintiff's action fail if such technical defense were the only one available to the defendants.

This memorandum being deemed sufficient as written findings of fact and conclusions of law the clerk is directed to enter judgment of "no cause of action" against the plaintiff and in favor of the defendants and intervenor with costs to the latter parties.